**Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.**

[461 A.2d 414]

No. 173-81

Present: Barney, C.J., Billings, Hill, Underwood and Peck, JJ.

Opinion Filed April 15, 1983

68.

*Villa & Heilmann,* Burlington, for Plaintiff-Appellant.

*Young & Monte,* Northfield, for Defendant-Appellee.

**Hill, J.** Plaintiff, a residential and commercial building contractor, brought this defamation action against defendant as a result of an erroneous credit report issued to defendant's subscribers (plaintiff's creditors). The credit report alleged that plaintiff had filed a voluntary petition in bankruptcy and, in addition, grossly misrepresented plaintiff's assets and liabilities. The false nature of the report's allegations has never been disputed.

In its complaint, plaintiff asserted that the consequences of defendant's report, which it insisted was published with reckless disregard for truth and accuracy, were a damaged business reputation, loss of company profits, and loss of money expended to correct the error. In response, defendant claimed both a constitutional and common law qualified privilege against defamation actions, and on that basis contended that since its report was published in good faith, it could not be held liable.

After a trial by jury, a verdict was returned in favor of plaintiff for $50,000 in compensatory or actual damages, and $300,000 in punitive damages. Thereafter, defendant filed timely motions for judgment notwithstanding the verdict, V.R.C.P. 50, and for new trial, V.R.C.P. 59, on the issues of liability and damages. The trial court, persuaded that the evidence was sufficient as a matter of law to create issues of fact for the jury as to both liability and damages, denied defendant's motions for judgment notwithstanding the verdict. Upon reviewing its jury instructions, however, the trial court concluded that it had incorrectly charged those standards of liability enunciated in *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323

(1974), and granted defendant's motions for new trial on all issues.

This action is before us pursuant to an interlocutory order by the Washington Superior Court, V.R.A.P. 5(b) (1), certifying five questions of law for our resolution. (1) Did the trial court err in granting defendant's motion for a new trial on all issues? (2) If the answer to the first question is in the affirmative, should the court have entered judgment on the verdict? (3) If the answer to the first question is in the affirmative, should the court have ordered a new trial on: (a) damages only? (b) compensatory damages only? (c) punitive damages only? (4) Did the court err in denying all motions of the defendant for judgment notwithstanding the verdict? (5) If the answer to the fourth question is in the affirmative, should the court have: (a) granted defendant's motion to enter judgment for the defendant on the issue of punitive damages, notwithstanding the verdict? (b) granted the motion of the defendant for judgment on the issue of compensatory damages, notwithstanding the verdict? (c) granted judgment for the defendant on all issues? In light of our disposition of the first four questions, we need not address the fifth question.

We begin with a review of the record. Defendant operates a business in which factual and financial reports about individual business enterprises are issued exclusively to subscribers of defendant's service. These subscribers, usually creditors of the reported enterprises, may contract for "continuous service reports" which enable them to receive all report updates about a particular business over a year's time from the subscriber's initial inquiry. The reports are based on information solicited from the business itself, the business' banking and credit sources, from trade suppliers, and from public records such as annual reports filed with the Secretary of State and reports of bankruptcy petitions.

On or about July 26, 1976, plaintiff's president met with a representative of its principal creditor, a bank, to discuss the possibility of future financing. During the meeting, the bank's representative informed plaintiff's president that he had just received a credit report issued by defendant indicating that plaintiff had recently filed a voluntary petition in bankruptcy. Plaintiff's president testified that he was both shocked and confused when confronted with the report, since

plaintiff had never filed such a petition and, at the time the report was published, plaintiff's business was steadily expanding. In fact, plaintiff's president later testified that prior to the issuance of the credit report, plaintiff had never suffered a major economic reversal and its financial condition was sound. Nevertheless, despite the bank representative's trial testimony that he never really believed the report, the bank put off any future consideration of credit to plaintiff until the discrepancy was cleared up. The bank later terminated plaintiff's credit allegedly for reasons unrelated to the report.

Plaintiff's president immediately contacted defendant's regional office in Manchester, New Hampshire. He explained the error to defendant's regional supervisor and requested, in addition to an immediate correction, a list of those creditors who had received the false reports in order that they might be reassured of plaintiff's solvency. Defendant's representative stated that the matter would be looked into, but refused to divulge to plaintiff's president the names of the creditors who had received the report.

The basis of the error was established at trial: a former employee of plaintiff, and not plaintiff, had filed a voluntary petition in bankruptcy. Defendant's employee, a seventeen-year-old high school student, paid $200 annually to review Vermont's bankruptcy petitions, had inadvertently attributed the former employee's bankruptcy petition to plaintiff itself, and reported the information as such to defendant. A representative of defendant testified that prior to the issuance of a credit report indicating a bankrupt business, it was defendant's routine practice first to check the report's accuracy with the business itself. No prepublication verification was ever attempted in the present case.

On or about August 3, 1976, having satisfied itself that its credit report on plaintiff was wrong, defendant issued a corrective notice to the five subscribers who had received the initial report. In substance, the corrective notice stated that it was a former employee of plaintiff, not plaintiff itself, who had filed the petition in bankruptcy, and that plaintiff "continued in business as usual." Plaintiff informed defendant that it was dissatisfied with the corrective notice, since it implied that the initial mistake was attributable to plaintiff, not de-

fendant. Plaintiff again demanded a list of subscribers who had seen the report, but its request was once again denied.

Thereafter, plaintiff refused to provide defendant with any further financial data, and requested that defendant inform anyone seeking such data that they were being withheld pending the outcome of plaintiff's defamation action against defendant. Instead, defendant issued plaintiff a "blank rating," indicating that plaintiff's circumstances were "difficult to classify" within defendant's rating system, and such information was distributed to those creditors who requested a current indication of plaintiff's financial status. A short while later, plaintiff commenced its defamation action.

## I.

In *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court held that a "public official" was prohibited "from recovering damages for a defamatory falsehood relating to his official conduct unless he [or she] proves that the statement was made with 'actual malice,'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80; *Burns* v. *Times Argus Association*, 139 Vt. 381, 384, 430 A.2d 773, 775 (1981). Three years later, the media protection established in *New York Times* was extended to cover defamatory falsehoods published about "public figures." *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 155 (1967). In *Gertz* v. *Robert Welch, Inc., supra,* the Supreme Court, in the last major pronunciation of protections afforded the media in defamation actions, held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a *private individual." Id.* at 347 (emphasis added). Although *Gertz* permitted a "private individual" to recover actual damages, presumed or punitive damages were not permitted absent proof of the *New York Times* standard "of knowledge of falsity or reckless disregard for the truth." *Id.* at 348.

The critical issue underlying the certified questions presented, a matter of first impression for this Court, is whether the First and Fourteenth Amendments to the United States

Constitution require that the qualified protections afforded the media in "private" defamation actions, as set forth in *Gertz,* be extended to actions involving nonmedia defendants. Although the issue has never been decided by the United States Supreme Court, see *Hutchinson* v. *Proxmire,* 443 U.S. 111, 133 n.16 (1979), it has been addressed in a number of state courts. See, e.g., *Denny* v. *Mertz,* 106 Wis. 2d 636, 318 N.W.2d 141 (1982) ; *Rowe* v. *Metz,* 195 Colo. 424, 579 P.2d 83 (1978) ; *Harley-Davidson Motorsports, Inc.* v. *Markley,* 279 Or. 361, 568 P.2d 1359 (1977) ; *Jacron Sales Co.* v. *Sindorf,* 276 Md. 580, 350 A.2d 688 (1976). Since the basis of the trial court's decision to grant a new trial was its allegedly faulty jury instruction regarding the *Gertz* standards of liability and damages, a threshold determination as to *Gertz's* applicability to the facts of this case is crucial.

In support of its claim that *Gertz,* as a matter of federal constitutional law, should apply to nonmedia as well as media defendants, defendant asserts that the former have equally compelling First Amendment rights worthy of constitutional protection, and as such it questions the logic of affording the press exclusive immunity from the consequences of defamation. Additionally, defendant insists that distinctions between media and other information disseminating defendants are quite often illusory, and concludes that it should be considered a "publisher or broadcaster" for purposes of First Amendment protection.

We are fully aware that in certain instances the distinction between media and nonmedia defendants may be difficult to draw. However, no such difficulty is presented with credit reporting agencies, which are in the business of selling financial information to a limited number of subscribers who have paid substantial fees for their services. As a result of a contractual arrangement between defendant and its subscribers, the procured information is to be kept confidential. There is a clear distinction between a publication which disseminates news for public consumption and one which provides specialized information to a selective, finite audience. We therefore reject, as have the majority of circuit courts, the assertion that credit agencies such as defendant are the type of media worthy of First Amendment protection as con-

templated by *New York Times* and its progeny. See, e.g., *Millstone* v. *O'Hanlon Reports, Inc.*, 528 F.2d 829, 833 (8th Cir. 1976); *Hood* v. *Dun & Bradstreet, Inc.*, 486 F.2d 25, 29 (5th Cir. 1973), *cert. denied*, 415 U.S. 985 (1974); *Oberman* v. *Dun & Bradstreet, Inc.*, 460 F.2d 1381, 1383 (7th Cir. 1972); *Kansas Electric Supply Co.* v. *Dun & Bradstreet, Inc.*, 448 F.2d 647, 649 (10th Cir. 1971), *cert. denied*, 405 U.S. 1026 (1972); *Grove* v. *Dun & Bradstreet, Inc.*, 438 F.2d 433, 437 (3d Cir.), *cert. denied*, 404 U.S. 898 (1971).

Moreover, in carefully surveying the decisions of those jurisdictions which have specifically addressed the issue of whether *Gertz* should be applied to nonmedia defendants, we note that the majority have refused such an extension. Although we are not bound by these decisions, their reasoning is both persuasive and compelling. In nonmedia defamation actions, "[t]he crucial elements . . . which brought the United States Supreme Court into the field of defamation law are missing. There is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press." *Harley-Davidson Motorsports, Inc.* v. *Markley, supra,* 279 Or. at 366, 568 P.2d at 1362–63. Consequently, the Supreme Court of Oregon concluded:

> Because a private individual's right to recover for libel has been made more difficult in situations in which his interests have been at least partially out-weighed by important constitutional values, it does not follow, for obvious reasons, that his recovery should be made more difficult in situations in which no such constitutional values are involved merely for the sake of securing symmetry of treatment of defendants. It is our conclusion that *Gertz* does not require application of the constitutional privilege to actions of defamation between private parties insofar as the issues raised here are concerned.

*Id.* at 370–71, 568 P.2d at 1365. For other cases holding *Gertz* inapplicable to nonmedia defamation actions, see generally *Denny* v. *Mertz, supra; Fleming* v. *Moore,* 221 Va. 884, 275 S.E.2d 632 (1981); *Schomer* v. *Smidt,* 113 Cal. App. 3d 828, 170 Cal. Rptr. 662 (1980); *Gengler* v. *Phelps,* 92 N.M. 465,

589 P.2d 1056 (1978) ; *Rowe* v. *Metz, supra; Retail Credit Co.* v. *Russell,* 234 Ga. 765, 218 S.E.2d 54 (1975) ; cf. *Jacron Sales Co.* v. *Sindorf, supra;* Restatement (Second) Torts § 580B comment e (1977).

In light of the above, we are convinced that the balance must be struck in favor of the private plaintiff defamed by a nonmedia defendant. "Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at 340 (quoting *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at 270). Accordingly, we hold that as a matter of federal constitutional law, the media protections outlined in *Gertz* are inapplicable to nonmedia defamation actions.

## II.

In the alternative, defendant contends that in the absence of a constitutional mandate, this Court should nevertheless adopt *Gertz* in the interests of fairness, simplicity and clarity in our state common law. Defendant's argument is based on the fear that without a heightened standard of protection in defamation actions, individuals will withdraw from, rather than pay the price of entry into, "the marketplace of ideas." Moreover, defendant insists that our common law, like the common law in the vast majority of other jurisdictions, see W. Prosser, Law of Torts § 115 (4th ed. 1971), and cases cited in Annot., 30 A.L.R.2d 776 (1953), has already recognized, at least implicitly, a qualified common law privilege for credit reporting agencies. We disagree.

In *Nott* v. *Stoddard,* 38 Vt. 25 (1865), this Court recognized that there are certain exceptions to our general common law rule that malice will be presumed when words are in themselves defamatory and thus actionable per se:

> Cases of giving the character of servants, confidential advice for some legitimate purpose, communications to persons who ask for information and have a right or interest to know, are of this character. In such cases malice must be proved by extrinsic evidence, or inferred as matter of fact by the jury from the circumstances.

*Id.* at 32. Although we have never *expressly* denied credit reporting agencies a qualified privilege, we have done so implicitly: "[I]f the words impute some quality, the natural tendency of which is to impair the plaintiff's professional or business character, as insolvency to a merchant, . . . they are actionable . . . ." *Darling* v. *Clement,* 69 Vt. 292, 300, 37 A. 779, 781 (1897) (citations omitted).

■ In balancing the equities between a credit reporting agency and the individual it has defamed through a false credit report, we note that "[a]n individual living in a world more and more dominated by large commercial entities is less able to bear the burden of the consequences of a false credit or character report than the agency in the business of selling these reports." *Retail Credit Co.* v. *Russell, supra,* 234 Ga. at 770, 218 S.E.2d at 58. In light of the fact that our common law has never recognized a qualified privilege against defamation actions for credit reporting agencies, and given the absence of compelling policy reasons to do so now, we decline to adopt the rules set forth in *Gertz* as part of our common law.

### III.

■ With regard to the question of damages, we note that "the availability of both general and punitive damages in libel actions has not been rejected as a matter of constitutional law." *Michlin* v. *Roberts,* 132 Vt. 154, 163, 318 A.2d 163, 169 (1974). "When the defamation is actionable per se the plaintiff can recover general damages without proof of loss or injury, which is conclusively presumed to result from the defamation, but he is not required to rely solely upon the implications that are applicable and may present any evidence of a competent character that is authorized by his pleadings, for the purpose of showing the extent of the injury and the amount of the compensation that should be awarded." *Lancour* v. *Herald & Globe Association,* 112 Vt. 471, 475, 28 A.2d 396, 399 (1942) (citing *Nott* v. *Stoddard, supra,* 38 Vt. at 30).

■ Likewise, in accordance with this Court's belief that "[p]unitive damages are awarded to 'stamp the condemnation of the jury upon the acts of defendant on account of their malicious character,' " *Pezzano* v. *Bonneau,* 133 Vt. 88,

92, 329 A.2d 659, 661 (1974) (quoting *Goldsmith's Admr.* v. *Joy*, 61 Vt. 488, 500, 17 A. 1010, 1014 (1889)), their availability in defamation actions involving "malice" has never been questioned. *Lancour* v. *Herald & Globe Association, supra*, 112 Vt. at 478, 28 A.2d at 401 (citing *Smith* v. *Moore*, 74 Vt. 81, 86, 52 A. 320, 321 (1902)). Although each case stands upon its own facts, *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 154, 130 A. 758, 788 (1925), we have indicated that malice "may be shown by conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights." *Shortle* v. *Central Vermont Public Service Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979) (citing *Sparrow* v. *Vermont Savings Bank*, 95 Vt. 29, 33, 112 A. 205, 207 (1921)); *Lancour* v. *Herald & Globe Association, supra*, 112 Vt. at 482, 28 A.2d at 402; *Woodhouse* v. *Woodhouse, supra*, 99 Vt. at 155, 130 A. at 788.

Since "punitive damages are incapable of precise determination, their assessment is 'largely discretionary with the jury,'" *Lanfranconi* v. *Tidewater Oil Co.*, 376 F.2d 91, 96 (2d Cir. 1967) (quoting *Gray* v. *Janicki*, 118 Vt. 49, 52, 99 A.2d 707, 709 (1953)), and said assessment will not be interfered with unless "manifestly and grossly excessive." *Pezzano* v. *Bonneau, supra*, 133 Vt. at 91, 329 A.2d at 661 (quoting *Gray* v. *Janicki, supra*, 118 Vt. at 52, 99 A.2d at 709). We have cautioned, however, that though "the verdict may be considerably more or less than, in the judgment of the court, it ought to have been, still it will decline to interfere unless the amount is so great or small as to indicate that it is the result of perverted judgment, accident, or gross mistake." *Woodhouse* v. *Woodhouse, supra*, 99 Vt. at 157, 130 A. at 789.

## IV.

Guided by the rulings and principles outlined above, we turn to the certified questions raised by both parties regarding the propriety of the trial court's refusal to set aside the jury verdicts, V.R.C.P. 50, as well as its decision to grant a new trial on all issues. V.R.C.P. 59. As a basis for its motions, defendant argued that the verdicts were not supported by the evidence, in that the *Gertz* standards had not been met, that they

were the product of passion and not reason, and that they were clearly excessive. In its order, the trial court noted that it had reviewed the jury instructions, all memoranda submitted, the evidence of record, the verdict rendered by the jury and the applicable law. Persuaded that the evidence was "sufficient as a matter of law to create issues of fact for the jury with respect to both liability and damages," the trial court denied defendant's motions for judgment notwithstanding the verdict.

Defendant contends that the trial court abused its discretion in denying defendant's motions to set aside the verdicts. A careful review of the record discloses that defendant failed to renew, at the close of all the evidence, its earlier motions for a directed verdict on the issues of liability and compensatory damages. Thus, defendant's motions for judgment notwithstanding the verdict as to these two issues were properly denied. *Proctor Trust Co.* v. *Upper Valley Press, Inc.*, 137 Vt. 346, 349, 405 A.2d 1221, 1223 (1979); *Palmisano* v. *Townsend*, 136 Vt. 372, 375, 392 A.2d 393, 395 (1978); *Houghton* v. *Leinwohl*, 135 Vt. 380, 381–82, 376 A.2d 733, 735–36 (1977); V.R.C.P. 50(b).

In determining whether the trial court abused its discretion by refusing to set aside the punitive damages award on the grounds that it was excessive, this Court is "bound to indulge every reasonable presumption in favor of the ruling below, bearing in mind that the trial court was in the better position to determine the question." *Towle* v. *St. Albans Publishing Co.*, 122 Vt. 134, 142, 165 A.2d 363, 368 (1960) (citing *Lancour* v. *Herald & Globe Association, supra,* 112 Vt. at 483, 28 A.2d at 403). In short, defendant must show that the ruling is clearly untenable and without any reasonable basis of support in the record. *Id.* (citing *Stone* v. *Briggs*, 112 Vt. 410, 415, 26 A.2d 828, 831 (1942)); *Dashnow* v. *Myers*, 121 Vt. 273, 279, 155 A.2d 859, 864 (1959).

We are not persuaded that the trial court abused its discretion in denying defendant's motion to set aside the verdict as to the issue of punitive damages.* There was ample

---

* In its brief, defendant contends for the first time on appeal that in the

evidence in the record to enable the jury to conclude that defendant's conduct was insulting, reckless, and in total disregard of plaintiff's rights. *Shortle* v. *Central Vermont Public Service Corp., supra,* 137 Vt. at 33, 399 A.2d at 518. As noted above, "the size of the verdict alone does not indicate passion or prejudice by the jury." *Pezzano* v. *Bonneau, supra,* 133 Vt. at 91, 329 A.2d at 661 (citing *Gray* v. *Janicki, supra,* 118 Vt. at 51, 99 A.2d at 709). We are not convinced that the trial court abused its discretion in denying defendant's motions for judgment notwithstanding the verdict on the issue of punitive damages. Accordingly, the fourth certified question for review, whether the trial court erred in denying all motions of defendant for judgment notwithstanding the verdict, is answered in the negative.

In the second part of its order, the trial court, persuaded that its jury instructions "permitted the jury to believe that damages could be awarded to the [p]laintiff for defamation absent proof of damages and absent a showing of a knowledge of falsity or reckless disregard for the truth by the [d]efendant," granted defendant's motion for new trial on all issues. That is, defendant's motion for new trial was granted on the basis of the trial court's belief that its charge to the jury, insofar as it related to the *Gertz* standards of liability, was confusing. In view of the fact that our decision today holds *Gertz* totally inapplicable to the present case, we find the error harmless. In fact, we have carefully reviewed the jury instructions, and in addition to being properly charged in line with our common law rules as to liability and damages, defendant was afforded a common law qualified privilege against credit report agencies along with the ill-charged constitutional privilege outlined in *Gertz*. In short, defendant has nothing to complain about, since it received two beneficial charges to which it was not entitled.

---

absence of evidence of corporate involvement, punitive damages may not be assessed. We have repeatedly held that issues not raised below, even those having a constitutional dimension, will not be considered when presented for the first time on appeal. *State* v. *Patnaude,* 140 Vt. 361, 368, 438 A.2d 402, 404 (1981) (citing *State* v. *Prue,* 138 Vt. 331, 331–32, 415 A.2d 234, 234 (1980)).

*Certified questions one and two are answered in the affirmative; certified questions three, parts (a) through (c), and four are answered in the negative.*

