**Helen L. ALDRICH, Plaintiff-Appellee,**

v.

**THOMSON McKINNON SECURITIES, INC. and George A. Serhal, Defendants-Appellants.**

No. 469, Docket 84–7591.

United States Court of Appeals, Second Circuit.

Argued Nov. 27, 1984.

Decided Feb. 21, 1985.

Patricia M. Hynes, New York City (Milberg Weiss Bershad Specthrie & Lerach, New York City, Jared Specthrie, Elizabeth A. Shollenberger, New York City, of counsel), for plaintiff-appellee.

Harold R. Tyler, Jr., New York City (Patterson, Belknap, Webb & Tyler, New York City, Michael B. Mukasey, Blair Axel, Paul G. Gardephe, New York City, of counsel), for defendant-appellant Thomson McKinnon Securities, Inc.

Edward J. Boyle, New York City (Wilson, Elser, Edelman & Dicker, New York City, James M. Kaplan, New York City, of counsel), for defendant-appellant George A. Serhal.

Rosenman, Colin, Freund, Lewis & Cohen, New York City (Saul S. Cohen, Eric J. Wallach, Alan L. Doochin and Daniel R. Benson, New York City, of counsel), filed a brief for amicus curiae Securities Industry Ass'n, Inc.

Before LUMBARD, WINTER, and PRATT, Circuit Judges.

LUMBARD, Circuit Judge:

Thomson McKinnon Securities, Inc., a brokerage firm, and George Serhal, formerly a Thomson McKinnon account executive, appeal from a judgment of the Southern District that awarded Helen Aldrich $175,000 in compensatory damages, allocating $87,500 against each of the two defendants, $3,000,000 in punitive damages against Thomson McKinnon, and $12,500 in punitive damages against Serhal. The judgment was entered after a two-week jury trial, before Judge Duffy, at the conclusion of which the jury found that Thomas McKinnon and Serhal, as a consequence of fraudulent manipulation and churning in Aldrich's security account at Thomson McKinnon, were liable under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), Rule 10b–5, 17 C.F.R. § 240.10b–5 (1984), promulgated thereunder, and under applicable principles of the New York common law for fraud and breach of fiduciary duty.[1]

Although we see no error in the finding that defendants are liable for compensatory damages, we conclude that the punitive damage award against Thomas McKinnon is excessive and cannot stand. Accordingly, we remand with directions that the trial court enter an order for a new trial on all the issues, as to both defendants, unless Aldrich is willing to accept a judgment reducing the punitive damages against Thomson McKinnon to $1.5 million.

## I.

Aldrich met Serhal, then employed as an account executive at Thomson McKinnon, in early 1981, when she was considering transferring her brokerage account from Paine Webber. Her portfolio, initially worth approximately $300,000, to which $110,000 was later added, consisted principally of municipal bonds and some stock, which together generated an annual income that constituted Aldrich's principal means of support. At an initial meeting with Serhal to discuss her financial affairs, Aldrich explained that she was interested in increasing the income from her investment portfolio, in order to provide financial assistance to her elderly mother, but that she needed to maintain a large measure of safety in her investments.

Serhal then proposed an investment plan through which Aldrich could increase her annual income by selling her municipal bonds in order to purchase corporate utility bonds, which had a higher yield but were still within the category of conservative investments. The account executive consulted his branch manager at Thomas McKinnon in devising this investment strategy. According to Aldrich, Serhal then had her sign a blank option trading agreement, which Serhal later completed to inflate Aldrich's estimated annual income and falsely to characterize her investment objective as short-term trading, rather than safety of principal.

Commencing in March 1981, Serhal launched into a course of high volume, high risk trading in the Aldrich portfolio. More than 400 trades were undertaken in around 200 trading days. Total purchases in the account were $3,088,928.06, with sales also over $3 million. Serhal violated Thomson McKinnon internal guidelines concerning speculative trading on eight separate occasions between March and early October 1981. Specifically, Serhal disregarded the

---

**1.** The jury found for the defendants on a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 (1982).

rule providing that no more than 50 uncovered option contracts are permitted in any one underlying security in a single account. Superimposed on the margin requirements for speculative trading in uncovered options, this flat rule concerning dangerously high-risk trading applied to *all* accounts, whatever the resources or trading objectives of the customer.

While Serhal flagrantly manipulated Aldrich's account, even earning commissions on trading that resulted in Aldrich again owning the identical option or stock that she had just sold, Thomson McKinnon supervisors stood idly by. The supervisor who had advised Serhal on the bond swap initially contemplated for Aldrich never inquired about the discrepancy between this conservative investment strategy and the contents of papers such as the option trading agreement, which indicated that Aldrich was interested in speculative trading. Though Serhal was newly hired, and though one customer was providing the great bulk of his suddenly large income,[2] supervisors, for a period of seven months, failed to confront him with the daily, weekly, and monthly computer printouts recording patent trading abuses.

Serhal's immediate supervisors, who were responsible for monitoring Serhal's trading activities, indirectly profited from the churning of the account, as they were compensated by a salary plus bonus, with the bonus at least partially dependent upon commissions generated by the office. The commissions "earned" during Serhal's 10 month stewardship of the Aldrich account totalled $143,854—almost half the value of Aldrich's portfolio.

Finally, in early October, when Serhal was maintaining an option position in Aldrich's account that thrice exceeded the house's guideline concerning the number of uncovered options in one security, Serhal's supervisor advised him to decrease his trading activity. By this point, Serhal had generated over $80,000 in commissions. Trading declined somewhat for the balance of October and during November, but then, in December, it increased, with the knowledge of Serhal's supervisor. The heaviest losses, including a single loss of $50,000 on Christmas Eve, occurred during December.

At the end of December, apparently because a $60,000 margin call had provoked inquiry from the margin department, Serhal advised his supervisor that the Aldrich account, worth over $400,000 less than 10 months previous, was entirely exhausted. On the same day, Serhal informed his supervisor that there had been unauthorized trading in Aldrich's account. Serhal was placed on leave of absence and later terminated from his employment. Twenty-five thousand dollars in commissions were withheld from Serhal and retained by Thomson McKinnon.

II.

In view of the inexcusable and outrageous handling of Aldrich's account, it is not surprising that the appellants accept, with small complaint, the jury's award of compensatory damages—only $175,000 for losses of at least $400,000. Instead, both Thomson McKinnon and Serhal argue that it was error to permit the jury to make any award of punitive damage.

Thomson McKinnon argues that the jury was instructed, contrary to New York law, that punitive damages could be imposed on the brokerage house vicariously. Thomson McKinnon also claims that the evidence was insufficient to support a punitive damage award against it.[3] Serhal as-

**2.** In Serhal's first six months at Thomson McKinnon, prior to meeting Aldrich, the executive's total net commissions were $2,249. In January 1981, just before he acquired his new customer, Serhal had filed for personal bankruptcy.

**3.** In an amicus brief, the Securities Industry Association also challenges the punitive damage award, asserting that punitive damages may not be awarded on pendent state law claims in a case arising under the federal securities laws. In *Flaks v. Koegel,* 504 F.2d 702, 706–07 (2d Cir.1974), this court stated, in dictum, that punitive damages are apparently permissible on such claims. We now expressly hold that an award of punitive damages is permissible on pendent state law claims in a case arising under

serts that the district court erred in permitting the award of punitive damages, as New York law allows such recovery for common law fraud or breach of fiduciary duty only when fraudulent conduct was aimed at the general public, a circumstance, he alleges, that was not shown here. Serhal also contends that the compensatory damage judgment of $87,500 against each defendant was erroneous, as the jury award was joint and several, to total $87,500. Before turning to the issue of remittitur, each of these contentions will be discussed in turn.

### 1. *Jury Instructions.*

█ Under New York law, punitive damages may be awarded against a corporation only when continuing tortious conduct has been "brought home" to the consciousness of managerial personnel who have sufficient authority to prevent the damage, and who should have acted to do so. *Doralee Estates v. Cities Service Oil,* 569 F.2d 716, 722 (2d Cir.1977). In such circumstances, controlling corporate officers can be said to have authorized or, in some way, to have participated in the wrongful acts.

█ Thomson McKinnon contends that the jury was improperly instructed that punitive damages could be imposed on the brokerage house "vicariously," on the sole basis of a finding of Serhal's liability to Aldrich. The brokerage house relies primarily on the trial court's statement that:

> Once again, here, ladies and gentlemen, we have a situation where an employer can be vicariously liable for punitive damages because of the willful act or wanton act of his or it's (sic) employee.

This pronouncement, however, was immediately followed by language which qualified the preceding sentence:

> If the employer has been grossly negligent in permitting the employee to con-

tinue to work or if the act is done by the employee in a position where he is permitted to have a general run and management of the business, and this, ladies and gentlemen, must be proved as I explained to you by clear and convincing evidence.

The district court's actual instruction with regard to vicarious liability concerned, not the recovery of punitive damages, but the various theories upon which Thomson McKinnon could be held responsible. The court instructed that punitive damages could be awarded only where fraud was gross or wanton, involving acts or omissions that evidenced "reckless and callous disregard or indifference to the rights of one or more persons." The instructions, read as a whole, correctly informed the jury that Thomson McKinnon could be held liable for punitive damages only if persons in positions of authority within the organization had authorized, ratified or fostered the wrongful acts perpetrated by Serhal.

### 2. *Sufficiency of the Evidence.*

█ Thomson McKinnon next argues that there was insufficient evidence to support an award of punitive damages against the brokerage firm. We disagree.

The evidence amply supported a finding that Thomson McKinnon was reckless and wanton in its indifference to, and almost total disregard of, the gross manipulation and wasting of Aldrich's account. Though recently hired, the virtually unsupervised Serhal was given almost free run of the Thomson McKinnon house, and was never taken to task for patently excessive trading. Corporate officers initialed option trades in clear violation of the firm's internal guidelines. Inquiry came only after Serhal had purchased 150 naked options in *one* security—three times the number permitted by Thomson McKinnon's own rules.[4] We conclude that there was overwhelming

---

the federal securities laws. *See also Petrites v. J.C. Bradford & Co.,* 646 F.2d 1033 (5th Cir. 1981); *Mihara v. Dean Witter & Co.,* 619 F.2d 814 (9th Cir.1980).

**4.** As further evidence of Thomson McKinnon's gross negligence, we note that Serhal obtained

and kept his position at Thomson McKinnon by repeatedly giving false information or failing to disclose facts concerning previous employment, a prior criminal conviction, and his own bankrupt condition.

evidence to support a finding that Serhal's blatant manipulation of Aldrich's account was recklessly disregarded by Thomson McKinnon managerial personnel.

### 3. *Fraud on the Public.*

■ Serhal argues that, under New York law, punitive damages for fraud or breach of fiduciary duty may not be awarded unless a wrong was "aimed at the public generally," in which case such damages are available to redress a gross and wanton act or omission directed at and affecting all of society, rather than just an isolated individual. *Walker v. Sheldon,* 10 N.Y.2d 401, 404–05, 223 N.Y.S.2d 488, 490–91, 179 N.E.2d 497, 498–99 (1961). According to Serhal, the district court failed to instruct the jury as to the public fraud requirement and then erred in refusing to enter a judgment notwithstanding the verdict as, even assuming a proper instruction, there was insufficient evidence to support a finding that the wrong here was directed at the broader public. Again, we disagree.

> Judge Duffy instructed the jury that: The concept of punitive damages is to punish the wrongdoer for flagrant conduct against the plaintiff and against society.
>
> Punitive damages may be awarded so that the defendant will not repeat the offense and also to serve as a deterrent force and warning to others not to engage in the same conduct.

This instruction adequately conveyed the substance of the public fraud requirement, with its concern that punitive damages serve the purpose of a broader social good.[5]

■ Without question, the evidence supported a finding that the conduct of Serhal and the manner in which Thomson McKinnon supervised its account executives threatened, not just plaintiff Aldrich, but thousands of customers from the investing public. The jury could well believe that unless punitive damages were imposed, the accounts of other customers would be handled in the same grossly negligent and wasteful manner. If ever there was a case for the imposition of punitive damages against a brokerage firm and its employee, this is that case.

### 4. *Compensatory Damage Award.*

■ With regard to the award of compensatory damages, Serhal asserts that the district court erroneously entered judgment of $175,000 in favor of Aldrich, when the jury had found the liability of the defendants to be $87,500 and liability was joint and several. The confusion arises from the fact that the special interrogatories submitted to the jury invited them to answer separately as to each defendant the amount of compensatory damages to be recovered by plaintiff. The jury responded with the sum of $87,500, as to each defendant, on causes of action under section 10(b), under common law fraud, and under the common law of fiduciary duty.

We believe that the jury in this case intended to award the sum of $175,000 in compensatory damages to Aldrich. The jury separately assessed punitive damages against the defendants and, in the same way, assessed the amount of compensatory damages that each defendant would pay. We reiterate, however, that this form of verdict should be avoided where defendants, if liable, are liable jointly and severally for a single injury. *See Gagnon v. Ball,* 696 F.2d 17, 19 n. 2 (2d Cir.1982). The jury should be asked, instead, what amount of damages the plaintiff has suffered. Damages in this amount can then be awarded, jointly and severally, against each defendant found liable.

### III.

■ We turn, finally, to the $3 million punitive damage award entered against Thomson McKinnon. It is the duty of a court, as reaffirmed in countless cases in-

---

5. Though we need not decide the issue, we note that the New York Court of Appeals has suggested that the showing of a fraud on the public is no longer a prerequisite to the award of puni- tive damages. *See Borkowski v. Borkowski,* 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976).

volving large damage awards, " 'to keep a verdict for punitive damages within reasonable bounds considering the purpose to be achieved as well as the mala fides of the defendant in the particular case.' " *Lanfranconi v. Tidewater Oil*, 376 F.2d 91, 97 (2d Cir.), (quoting *Faulk v. Aware, Inc.*, 19 A.D.2d 464, 244 N.Y.S.2d 259 (1st Dept. 1963), *aff'd*, 14 N.Y.2d 899, 252 N.Y.S.2d 95, 200 N.E.2d 778 (1964), *cert. denied*, 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (1965)), *cert. denied*, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). Excessive punitive damage awards should be cut back where there is no specific and easily quantifiable error underlying the award, for damages should not be permitted to go beyond that amount reasonably necessary to secure the purposes of such awards, and thus to become in part a windfall to the individual litigant. *See Lenard v. Argento*, 699 F.2d 874, 890 (7th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983).

 Thomson McKinnon's wanton and reckless disregard of the trust placed in it by Aldrich was not only a wrong against her but, by what it portended for other unfortunate investors, it was a wrong against the general public. Thomson McKinnon, a seller of securities on national exchanges and over the counter, a member of the New York Stock Exchange and other leading exchanges, is a large, highly regulated, and socially significant institution. As the purpose of the punitive damage award is to punish and deter the offender, consideration by the jury of Thomson McKinnon's $2 billion assets and $162 million net worth was appropriate in arriving at the amount of punitive damages.

We note that the jury awarded only $175,000 in compensatory damages, although Aldrich sought $538,000 in actual damages, and her losses were at least $400,000. It may well be that, in awarding only $175,000, the jury felt that Aldrich's inattention to her own affairs, as well as her incredible gullibility, were a large factor in causing her losses. Be that as it may, and even though punitive damages need bear no exact relationship to compensatory damages, we are convinced, on this record, that $3 million goes considerably beyond what may fairly be justified in order to discourage repetition of Thomson McKinnon's grossly negligent conduct, or instances of such conduct by other brokerage firms. *Cf. Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1177–78 (10th Cir.1981) (reducing $3 million punitive damage award against brokerage firm to $1 million, even though compensatory damages were over $1 million), *cert. denied*, — U.S. —, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983).

IV.

Accordingly, we vacate the judgment of the district court and remand with directions that the trial court enter an order for a new trial on all the issues, and as to both defendants, unless plaintiff Aldrich is willing to accept a judgment reducing Thomson McKinnon's punitive damages to $1.5 million. If the remittitur is accepted, the judgment is, in all respects, affirmed.