**KELCO DISPOSAL, INC. and Joseph Kelley, Plaintiffs–Appellees, Cross–Appellants,**

**v.**

**BROWNING–FERRIS INDUSTRIES OF VERMONT, INC. and Browning–Ferris Industries, Inc., Defendants–Appellants, Cross–Appellees.**

**No. 563, Dockets 87–7754 and 87–7758.**

United States Court of Appeals, Second Circuit.

Argued Feb. 23, 1988.

Decided April 21, 1988.

Gordon B. Spivak, New York City (Thomas D. Brislin, Coudert Brothers, New York City, Robert B. Hemley, Norman Williams, Dennis R. Pearson, Gravel & Shea, Burlington, Vt., of counsel), for plaintiffs-appellees, cross-appellants.

J. Paul McGrath, New York City (Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Donald F. Turner, Washington, D.C., Douglas Richards and Robert Gerety, Plante, Richards, Hanley & Gerety, Springfield, Vt., of counsel), for defendants-appellants, cross-appellees.

Before FEINBERG, Chief Judge, PRATT, Circuit Judge, and McLAUGHLIN, District Judge for the Eastern District of New York, sitting by designation.

McLAUGHLIN, District Judge:

Plaintiff sued under both the federal antitrust laws and Vermont tort law. A jury found against defendants on both counts and imposed $6 million in punitive damages on the state claim. The trial court denied defendants' motions for judgment notwith-

standing the verdict or a new trial or remittitur; the court also ordered plaintiff to elect between its antitrust remedy (treble damages, attorneys' fees, and costs) and its state remedy (compensatory and punitive damages). The parties have cross-appealed. For the reasons discussed below, we affirm.

## FACTS

This case involves competition in the "roll-off" waste collection business in Burlington, Vermont. Roll-off waste collection is usually performed at large industrial locations and construction sites with the use of a large truck, a compactor, and a container that is much larger than the typical "dumpster."

Browning–Ferris Industries, Inc. ("BFI") and Browning–Ferris Industries of Vermont, Inc. (collectively "defendants") operate a commercial and industrial waste collection business from BFI's headquarters in Houston, Texas. In fiscal year 1986, BFI had revenues in excess of $1.3 billion, net income of approximately $137 million, and net assets of approximately $980 million.

In 1973 defendants made two fateful decisions: they decided to enter the waste disposal business in Burlington and they appointed plaintiff Joseph Kelley to be district manager for the region. In 1976 defendants began to provide roll-off service in Burlington, and by 1980 they controlled 100% of the Burlington roll-off market.

Kelley left defendants in 1980, and formed his own waste disposal company, plaintiff Kelco Disposal, Inc. ("Kelco"). Soon thereafter, Kelco began to compete head-to-head with defendants in the Burlington roll-off market. In one year Kelco captured 37.6% of the market. In 1982 the figure rose to 42.7%. During 1982, defendants' new Burlington manager, Richard Mowbray, received orders from Michael Gustin, his boss in Boston, to "Put [Kelley] out of business. Do whatever it takes. Squish him like a bug." Defendants' Burlington salesman was also ordered to put Kelley out of business and was told that if

"it meant give [services] away, give [them] away."

In the fall of 1982, accordingly, defendants cut their roll-off haul prices from $117 to $65, a reduction of about 40%. This price-cutting policy lasted for approximately six months, although some contracts made during this period extended these low prices into 1984. Defendants' market share, which had declined precipitously from 1980 to 1982, remained relatively stable during the 1982–84 period. Kelco's and defendants' combined revenues from the Burlington market were roughly $440,000. By 1985 Kelco had captured almost 56% of the market. In that year defendants left the market, and sold out to a third party. Since then, Kelco and this other company have been the only two competitors in the Burlington roll-off market. From 1981 to 1985, defendants and Kelco were the only competitors in the market.

In 1984, Kelley and Kelco brought this action. The complaint alleged that defendants had attempted to monopolize the Burlington roll-off market, in violation of section 2 of the Sherman Act, as amended, 15 U.S.C. § 2 (1982), and that defendants' conduct constituted intererence with contractual relations under Vermont tort law.

Kelley's claims were severed from Kelco's, and Kelco's antitrust and tort claims were tried to a jury. Kelco's antitrust theory was that defendants had engaged in predatory pricing. At trial, Kelco's expert witness testified that from 1982 to 1984 defendants' average variable cost for roll-off service was roughly $104 per haul. The expert included as variable costs disposal fees; drivers' salaries; depreciation of equipment, including trucks, containers, and compactors; selling and administrative costs; and national overhead. In addition, numerous statements by defendants' officials that defendants had intended to put plaintiff out of business were introduced.

After a six-day trial on the liability issue, the jury found against defendants on both counts. A one-day trial on damages followed, and the jury returned a verdict for $51,146 on the antitrust claim, and $51,146

in compensatory damages and $6 million in punitive damages on the state claim.

Defendants then moved for judgment n.o.v. or, in the alternative, for a new trial or remittitur. By order dated August 11, 1987 the motions were denied. An amended order of judgment dated October 19, 1987 awarded Kelco $153,438 in treble damages and $212,500 in attorneys' fees and costs on the antitrust claim under section 4 of the Clayton Act, 15 U.S.C. § 15 (1982) or, in the alternative, $6,066,082.74 in compensatory and punitive damages on the state claim. Kelco was ordered to elect between the alternative federal and state remedies.

On appeal defendants have mounted a three-pronged attack on the judgment: (1) the jury's liability verdict was not supported by sufficient evidence; (2) the trial court's jury charge was erroneous as a matter of law; and (3) the punitive damages award must be either reversed or remitted.

Kelco's cross-appeal argues that it is entitled under federal law to attorneys' fees and costs, even if it elects state-law compensatory and punitive damages over the more modest federal treble damage award.

## DISCUSSION

### I. Liability and Punitive Damages

#### A. *Attempted Monopolization*

##### 1. Sufficiency of the Evidence

Judgment n.o.v. is warranted where the verdict is so unsupported by the evidence that it "could only have been the result of sheer surmise and conjecture," or where the movant's position is supported by such overwhelming evidence that a "reasonable and fair minded [person] could not [have] arrived at a verdict against [it]." *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 168 (2d Cir.1980).

A claim of attempt to monopolize has three elements: "(1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a 'dangerous probability' that the attempt will succeed." *International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 790 (2d Cir.) ("*IDC*") (quoting *Northeastern Telephone Co. v. AT & T*, 651 F.2d 76, 85 (2d Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982)), *cert. denied*, —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). Defendants argue that Kelco failed to prove any of these elements at trial.

Kelco claims that defendants' anticompetitive or exclusionary conduct consisted of predatory pricing, and introduced evidence that defendants' price of $65 per roll-off haul was below its average variable cost of roughly $104 per haul. Defendants argue that Kelco's $104 figure was inflated because Kelco's expert witness mistakenly characterized certain fixed costs as variable in making his computations. Asserting that depreciation of equipment, selling and administrative costs, and national overhead should have been considered fixed costs, defendants contend that their true average variable cost was less than $50 per haul, well below their $65 haul charge.

A firm engaged in predatory pricing bites the bullet and forgoes present revenues to drive a competitor from the market. Its intent, of course, is to recoup lost revenues through higher profits when it succeeds in making the environment less competitive. *Northeastern Telephone*, 651 F.2d at 86 (quoting 3 P. Areeda & D. Turner, Antitrust Law ¶ 711b, at 151 (1978)); *see Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). Prices that are below reasonably anticipated marginal cost, and its surrogate, reasonably anticipated average variable cost, *see Northeastern Telephone*, 651 F.2d at 88, are presumed predatory. *Id.* By definition variable costs are dependent on the firm's output, while fixed costs are not. *See id.* at 86. The characterization of certain costs as either variable or fixed frequently becomes a battleground where the plaintiff proceeds on a predatory pricing theory. The reason is obvious: the higher a party's average variable cost, the more likely it is that the party has priced below that cost.

■ Defendants argue that equipment depreciation should have been considered a fixed cost because defendants' accountants have always treated it so. Passing, for the moment, the bootstrap feature of this argument, the general legal rule is that depreciation caused by use is a variable cost, while depreciation through obsolescence is a fixed cost. *See id.* The characterization of legitimately disputed costs is a question of fact for the jury. *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.,* 735 F.2d 884, 891 n. 6 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed. 2d 924 (1985); *see William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1036–38 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). The jury may consider, but obviously cannot be bound by, a party's characterization of its own costs.

■ In this case, we conclude that the jury could have reasonably characterized equipment depreciation as a variable cost. The waste disposal industry makes intensive use of heavy equipment. There was no evidence presented that defendants' trucks, compactors, or containers became obsolete; rather, the picture painted was one of constant wear, tear, and damage due to use.

■ Defendants do not challenge the characterization of disposal fees and drivers' salaries as variable costs. Adding equipment depreciation costs to these other costs yields an average variable cost of roughly $81 per haul, well above defendants' $65 fee. Based on these figures alone, we conclude that the jury could have found that defendants engaged in predatory pricing. There is, therefore, no need to address defendants' challenge to the characterization of other costs.

■ Turning to the second element of an attempted monopolization claim, we reject defendants' attack upon the finding that they had specific intent to monopolize the market. Sufficient evidence of such intent was presented to the jury. Defendants' own officials frequently reaffirmed their goal of driving Kelley and Kelco out of the Burlington market. Defendants argue, as

they did to the jury, that these statements merely reflected defendants' desire to remain competitive with Kelco, and cannot support a finding of specific intent to monopolize. The jury, however, also heard evidence that defendants had engaged in predatory pricing, and could have inferred intent from this fact. *See Northeastern Telephone,* 651 F.2d at 85. The "tough talk" by defendants' employees, coupled with the proof of predatory pricing, more than supports the jury's finding of a specific intent to monopolize.

Defendants' final challenge to the verdict is that, because the so-called "barriers to entry" in the Burlington roll-off business were low, a rational jury could not have concluded that there was a dangerous probability that BFI would monopolize the market. We reject this argument for three reasons.

■ First, the jury could have found that barriers to entry were, indeed, not at all low. Only two companies entered the relevant market during the eleven-year period from 1976–87. In addition, there was evidence that the cost of entering the market exceeded $300,000. Given the size of the market in 1982–84, roughly $440,000 in annual revenues, a firm that controlled 50% of the market and had a 10% return on revenue—which the parties do not dispute is a fair rate of return—would realize only a $22,000 annual profit. Such numbers would make a potential entrant think twice before making a $300,000 investment. *Compare United States v. Waste Management, Inc.,* 743 F.2d 976, 983 (2d Cir.1984) (finding of low entry barriers in large metropolitan waste disposal market with many competitors was not clearly erroneous).

Second, numerous market characteristics other than barriers to entry must be considered in determining whether a dangerous probability of monopolization exists. *See IDC,* 812 F.2d at 792 (some other factors are "the strength of the competition, the probable development of the industry, ... the nature of [defendants'] anticompetitive conduct and the elasticity of consumer demand"). A survey of these

other characteristics amply supports a finding of dangerous probability in this case. The Burlington waste disposal market was not unduly competitive. It supported only one participant in 1980, and two from 1981 to 1987. Consumer demand was rather inelastic because there were few, if any, alternatives to large-container waste disposal service. On top of this, there was compelling evidence that defendants intended to monopolize the market and were already executing a plan to further this goal.

Third, defendants possessed a significant market share. During the period in which defendants engaged in predatory pricing, their market share was above 55%. As late as 1980, their share had been 100%. Considering defendants' market share along with other market characteristics, the jury could reasonably have concluded that defendants had a dangerous probability of acquiring monopoly power.

In summary, we find that Kelco presented sufficient evidence for the jury to find that defendants attempted to monopolize the Burlington roll-off waste disposal market. Defendants concede that if Kelco prevails on the antitrust claim, then the defendants are also liable on the state tort claim. Accordingly, we conclude that the jury verdict on both claims is supported by sufficient evidence.

### 2. The Jury Charge

■ Defendants contend that the trial judge erroneously instructed the jury that Kelco could prove predatory pricing by showing that defendants had priced below their average variable cost; defendants now opt for a stricter standard: their *reasonably anticipated* average variable cost. Interesting as the distinction is, we need not address this argument because defendants have failed to preserve it for appeal under Fed.R.Civ.P. 51.

Defendants' proposed jury charge did not refer to reasonably anticipated variable costs. Although counsel for defendants did refer to reasonable anticipation at a charging conference, he did so in the context of the specific intent element of attempted monopolization, not the predatory pricing element. We thus conclude that defendants failed to state distinctly their objection to the challenged portion of the judge's charge. See Fed.R.Civ.P. 51. Absent plain error, defendants are precluded from raising the issue on appeal. *See Brenner v. World Boxing Council*, 675 F.2d 445, 456 (2d Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *Cohen v. Franchard Corp.*, 478 F.2d 115, 122–25 (2d Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973).

■ Assuming arguendo that the charge was incorrect, we do not conclude that the error constituted plain error. Given the complexity of this case and the quantum of evidence supporting Kelco's claim of anticompetitive conduct by defendants, we find that the trial court's error was not sufficiently serious to affect the " 'very integrity of the trial.' " *Brenner*, 675 F.2d at 456 (quoting *Modave v. Long Island Jewish Medical Center*, 501 F.2d 1065, 1072 (2d Cir.1974)). Accordingly, we decline to review defendants' assignment of error.

### B. *Punitive Damages*

■ Defendants' final argument is that the $6 million punitive damage award should be reversed or remitted. Punitive damages are designed both to punish the wrongdoer and to deter similar conduct. *See Aldrich v. Thomson McKinnon Securities, Inc.*, 756 F.2d 243, 249 (2d Cir.1985). Vermont law, which applies here, *see Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir.1986), invests a jury with enormous discretion to award punitive damages when it decides that a party has acted maliciously. *See Pezzano v. Bonneau*, 133 Vt. 88, 90, 329 A.2d 659, 660 (1974). Vermont, like most jurisdictions, views punitive damage awards as " 'incapable of precise determination.' " *Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.*, 143 Vt. 66, 77, 461 A.2d 414, 419 (1983) (quoting *Lanfranconi v. Tidewater Oil Co.*, 376 F.2d 91, 96 (2d Cir.), *cert. denied*, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967)), *aff'd on other grounds*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Vermont courts have

refused to require that there be some kind of mystical ratio between punitive and compensatory damages. *See Pezzano,* 133 Vt. at 92, 329 A.2d at 661; *see also Aldrich,* 756 F.2d at 249 ("punitive damages need bear no exact relationship to compensatory damages"). Finally, Vermont courts will interfere with a punitive damages award only if it is " ' "manifestly and grossly excessive." ' " *Greenmoss,* 143 Vt. at 77, 461 A.2d at 420 (quoting *Pezzano,* 133 Vt. at 91, 329 A.2d at 661 (quoting *Gray v. Janicki,* 118 Vt. 49, 52, 99 A.2d 707, 709 (1953))).

Bearing this in mind, we conclude that the punitive damage award in this case should not be disturbed. Faced with evidence that defendants wilfully and deliberately attempted to drive Kelco out of the market, the jury imposed punitive damages amounting to less than .5% of BFI's revenues, approximately .6% of its net worth, and less than 5% of its net income, for fiscal year 1986. This amount is not inconsistent with punitive damages levied in other jurisdictions against large corporations. *E.g., T.D.S., Inc. v. Shelby Mutual Insurance Co.,* 760 F.2d 1520, 1531 & n. 10 ($2.1 million award was approximately 1% of defendant's assets), *modified in part,* 769 F.2d 1485 (11th Cir.1985); *Aldrich,* 756 F.2d at 249 (remitting award to $1.5 million, which was roughly .9% of defendant's net worth); *Hawkins v. Allstate Insurance Co.,* 152 Ariz. 490, 501, 733 P.2d 1073, 1085 ($3.5 million award amounted to roughly .25% of defendant's assets and 1% of defendant's annual income), *cert. denied,* — U.S. —, 108 S.Ct. 212, 98 L.Ed. 2d 177 (1987); *Downey Savings and Loan Association v. Ohio Casualty Insurance Co.,* 189 Cal.App.3d 1072, 1101, 234 Cal. Rptr. 835, 851 ($5 million award exceeded 7% of defendant's annual income, and was 1% of defendant's net worth), *review denied,* No. S 000553 (Cal. May 27, 1987), *petition for cert. filed,* 56 U.S.L.W. 3115 (U.S. July 22, 1987) (No. 87–159); *Moore v. American United Life Insurance Co.,* 150 Cal.App.3d 610, 641–42, 197 Cal.Rptr. 878, 899 (1984) ($2.5 million award exceeded 6% of defendant's annual income).

■ After reviewing the record, we conclude that the punitive damage award fell within the allowable limits of Vermont law, and was not motivated by unfair prejudice. *See Pezzano,* 133 Vt. at 91, 329 A.2d at 661. In addition, we reject the defendants' notion that the award violates the eighth amendment's proscription against excessive fines. Even if the eighth amendment does apply to this nominally civil case, *see Ingraham v. Wright,* 430 U.S. 651, 664–72, 97 S.Ct. 1401, 1409–13, 51 L.Ed.2d 711 (1977); *Zwick v. Freeman,* 373 F.2d 110, 119 (2d Cir.), *cert. denied,* 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967); *see also Bankers Life and Casualty Co. v. Grenshaw,* No. 85–1765, 56 U.S.L.W. 3423–24 (U.S. argued Nov. 30, 1987), we do not think the damages here were so disproportionate as to be cruel, unusual, or constitutionally excessive. Accordingly, we decline to interfere with the punitive damage award.

## II. Attorneys' Fees

■ Kelco's cross-appeal demands attorneys' fees under 15 U.S.C. § 15 when it rejects a modest federal remedy in favor of a generous state law remedy. Kelco maintains that because the fee award is not duplicative or inconsistent with the state remedy, it should not be precluded from receiving federal statutory attorneys' fees in addition to its state tort remedy. Defendants respond that Kelco's state claim provides it with a complete remedy, and that an additional award of attorneys' fees would provide Kelco with a windfall.

Section 15 is a statutory exception to the common law rule against awarding attorneys' fees. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 260–61, 95 S.Ct. 1612, 1623–24, 44 L.Ed.2d 141 (1975). As explained in great depth by the *Alyeska Pipeline Court,* the general rule, more commonly known as the "American Rule," dictates that, absent statutory authority, a prevailing party is not entitled to compensation for its attorneys' fees. *See id.* at 247–62, 95 S.Ct. at 1616–24. This rule has strong roots in American jurisprudence, *see Arcambel v. Wiseman,* 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796), and rests

upon the common law judgment that "one should not be penalized for merely defending or prosecuting a lawsuit." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967).

The common law hostility to attorneys' fees rests upon several considerations that include the potential chilling effect that fee shifting would have on indigents with compelling claims, "the time, expense, and difficulty or litigating the fee question, and the possibility that the principle of independent advocacy might be threatened by having 'the earnings of the attorney flow from the pen of the judge before whom he argues.'" *Summit Valley Industries, Inc. v. Local 112, United Brotherhood of Carpenters*, 456 U.S. 717, 725, 102 S.Ct. 2112, 2116–17, 72 L.Ed.2d 511 (1982) (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)).

Kelco wears two hats in this action. It wears one as a private victim seeking personal redress for an egregious infraction of Vermont tort law. It wears the other as a public defender of broad social objectives that casts it in the role of a surrogate enforcer of the federal antitrust laws. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 131, 133, 89 S.Ct. 1562, 1580–81, 1581–82, 23 L.Ed.2d 129 (1969); *Waldron v. Cities Service Co.*, 361 F.2d 671, 673 (2d Cir.1966), *aff'd*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). In the latter capacity, to recover treble damages and thereby deprive violators of the fruit of their illegality, *see Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 485, 97 S.Ct. 690, 695–96, 50 L.Ed.2d 701 (1977), a plaintiff must prove behavior that injures competition, as distinct from a competitor. *Cargill*, 107 S.Ct. at 489; *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). A plaintiff that undertakes the role of private attorney general and recovers treble damages, is awarded attorneys' fees for safeguarding paramount and pervasive values that are protected by federal law.

The question presented is whether a plaintiff that chooses to forgo treble damages available under § 15 and elects instead a far larger reward under state law may still collect attorneys' fees. Not surprisingly, the sparse language of § 15 and its extensive legislative history fail to address this issue.

We are unwilling to depart from the general rule and "fashion [a] drastic new rule[ ] with respect to the allowance of attorneys' fees to the prevailing party in federal litigation." *Alyeska Pipeline*, 421 U.S. at 269, 95 S.Ct. at 1627. Two reasons buttress this conclusion. First, the policy embodied in § 15 will in no way be hindered by our holding because the sum available in the state remedy package exceeds the sum of treble damages, attorneys' fees, and costs. Second, a plaintiff that chooses not to pursue its federal remedy has stepped outside its role as private attorney general, and thus should not come within the ambit of § 15.

Where, as here, the prevailing party elects a remedy provided by state law, and thereby forgoes its treble damage award, it should forgo the entire remedy provided by federal law, including attorneys' fees. Attorneys' fees are an integral member of the federal remedy. This is one of those cases where the tail must go with the hide. Having turned its back on the federal remedy, Kelco must perforce lose the federal reward. In any event, its $6 million dollar punitive damage award should provide an adequate fund from which Kelco may pay its attorneys' fee without discomfiture. We therefore conclude that the district court properly ordered Kelco to elect between the alternative remedies.

## CONCLUSION

For the forgoing reasons the judgment of the district court is affirmed.