470 A.2d 110

**Charles LESLIE, d/b/a L & W Company, Appellant,**

**v.**

**PENNCO, INC.**

Superior Court of Pennsylvania.

Argued June 8, 1983.

Filed Dec. 2, 1983.

Reargument Denied Feb. 13, 1984.

Will J. Schaaf, Erie, for appellant.

Norman H. Stark, Erie, for appellee.

Before CERCONE, President Judge, and SPAETH and HESTER, JJ.

CERCONE, President Judge:

Plaintiff, Charles Leslie, d/b/a L & W Company, appeals the lower court's denial of his motions n.o.v. and for a new trial which followed a jury verdict in favor of defendant Pennco, Inc., appellee herein. Appellant contends that the weight of the evidence elicited at trial does not support appellee's contention that based on language appearing in a purchase order, it was empowered with an option to terminate the entire contract between the parties on a quarterly basis. We agree with appellant and reverse the judgment entered by the lower court, and grant appellant a new trial.

The general rule for a grant of a new trial on the basis that it is against the weight of the evidence allows the granting of a new trial only when the jury's verdict is contrary to the evidence as to shock one's sense of justice and a new trial is necessary to rectify this situation. *Burrell v. Philadelphia Electric Co.*, 438 Pa. 286, 265 A.2d 516 (1970); *Brown v. McLean Trucking Co.*, 434 Pa. 427, 256 A.2d 606 (1969); *Jones v. Williams*, 358 Pa. 559, 58 A.2d 57 (1948). Unlike appellate review of a refusal to enter a judgment n.o.v., where the evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict winner, the appellate court, in reviewing the refusal to grant a new trial, ordinarily considers all of the evidence. *Abbott v. Steel City Piping Co.*, 437 Pa. 412, 263 A.2d 881 (1970).

The decision of the lower court, either granting or refusing a new trial, is considered to be within the sound discretion of the trial judge and will be reversed on appeal only if the appellate court determines that the trial court palpably abused its discretion. *Ditz v. Marshall*, 259 Pa.Superior Ct. 31, 393 A.2d 701 (1978). We find that the instant case justifies a reversal under the above test.

In 1978, Charles Leslie, appellant, was approached by Jack Wheeler who was a manufacturer's representative for Iroquois Tool Company. Wheeler told Leslie that his company had been offered a contract by Pennco to manufacture seventy-five hundred humidifiers, to be completed in a year's time. (Pennco had been licensed to manufacture and distribute the humidifier.) Wheeler asked Leslie if he was interested in manufacturing them. Leslie expressed his interest and subsequently went with Wheeler and a Mr. Haas, of Iroquois, to discuss the idea with Thomas Fadale, president of Pennco. Apparently no written agreement was drawn up, but a purchase order was sent from Pennco to L & W, the company which Leslie formed for the express purpose of manufacturing these 7500 humidifiers. The purchase order set a price of $32.00 per humidifier to be paid after each delivery; this figure provided L & W with an $11.00 profit on each humidifier. Leslie borrowed fifty thousand dollars from the bank which is what Iroquois demanded for tooling and consulting service, and for rights to the contract.

The purchase order set forth the agreement for Pennco's order of 7500 humidifiers as a "blanket order for 5–15–78 through 4–15–79." It specified certain dates for production and set the rate for delivery. Nine hundred units were to be completed by the end of the first quarter. After that, 750 units were to be delivered each month. After 3,946 humidifiers were delivered to Pennco, it refused to accept further delivery. This refusal left approximately 3,530 of the ordered humidifiers unmanufactured.

At the bottom of the purchase order were the words: "PLEASE NOTE THE ABOVE RELEASE SCHEDULE TO BE REVIEWED QUARTERLY."

The evidence is unconstradicted that the parties never arrived at a mutual understanding that this phrase meant that Pennco could terminate its agreement as part of its quarterly review and thereby reject the remainder of the humidifiers. Nevertheless, Thomas Fadale of Pennco testi-

fied at trial that, in his mind, the phrase included just such an option.

> If sales were good—and we anticipated that they would be; we had—we were going to do an awful lot to make them by that way—we could increase production; but if sales were bad, as they turned out, then we could decrease production and possibly stop it.

Fadale also testified that the custom in the industry supported his interpretation.

On cross examination, this exchange occurred:

Q. [by Mr. Schaaf, attorney for plaintiff-appellant]: My question is this: Did you and Mr. Haas at any time discuss the idea that you could terminate this contract and not buy seventy-five-hundred units?

A. [by Fadale]: No, sir.

Q. Then you agree with me that what was contemplated here was that Haas and Iroquois would supply seventy-five-hundred in the—in the monthly projections and you would ultimately buy seventy-five hundred.

A. No, sir, I don't agree with you on that.

Q. You don't agree?

A. No.

Q. Well, I thought a moment ago you said that you were obligated to buy the seventy-five-hundred. Did you talk about buying fewer than that and terminating?

A. We did not discuss buying fewer, but on the bottom of the purchase order we did put the statement that we could review quarterly, which meant that we could increase our production—or his production or decrease his production.

Q. Mr. Fadale, I'm going to ask you the question again because obviously I didn't make it clear. I'm going to make it very simple. Recognizing you could increase or decrease by a quarterly review the monthly deliveries, recognizing that, did you ever with Mr. Haas discuss the idea that you could walk in and say

stop, we are not going to buy the full seventy-five-hundred?

A. No.

Q. Now, when that matter—When it came time for a purchase order to be given to L & W, this matter never even came up, did it?

A. No, sir.

Q. It was never even discussed between you and Mr. Leslie.

A. No.

Q. The only discussions of rescheduling were with Mr. Haas at Iroquois and neither with Mr. Haas nor indeed with Mr. Leslie was there any suggestion that you could buy fewer than seventy-five-hundred units. Do you agree with me?

A. Yes.

The explanation of Fadale corroborated that of appellant Leslie who answered as follows in response to his own attorney's questions on direct examination:

Q. Now, in capital letters down at the bottom of the page would you read to the Court and the jury what it says?

A. "Please note the above release schedule to be reviewed quarterly."

Q. What is the, quotes, above release schedule? What is that?

A. Release schedule is up above here. There's—in capital letters it says, "Released as follows." This is following the amount of humidifiers that were ordered within the designated amount of time, and this was merely the rate at which we would—we are asked to produce and deliver the humidifiers.

Q. Now, was that acceptable to you to permit the review of the release schedule as you went along?

A. Yes, sir, it was.

Q. And what was the background discussion that led to the insertion of that phraseology?

A. It was posed to me that this was the start and that they would—they anticipated wanting a greater number or wanted them faster than seven-hundred-and-fifty a month as the sales program took off.

Q. When you say "they," would you identify the person with whom you discussed this matter?

A. Tom Fadale.

Q. And at any time did you and Mr. Fadale talk about the contingency of reducing that monthly release schedule?

A. No, sir.

Q. Was there ever any hint or indication at any time that at a given quarter the whole deal could be canceled?

A. No, sir.

Thus, it is uncontradicted that the parties never came to a mutual understanding regarding the meaning of the phrase: "The above release schedule to be reviewed quarterly."

Appellee asserts, however, that Leslie, who was an experienced businessman, knew or should have known that the phrase implied that appellee could stop production if the humidifiers did not sell. Appellee contends that orders such as that involved within are customarily terminated if a product does not sell and that appellant should have known this, despite the fact that they never discussed the possibility.

■ However, more is necessary in a consideration of custom as it relates to intent than a party's own statement of just what the custom is. As this court has held

> Evidence of an industry custom or usage which is notorious, well-established and reasonable is always a relevant consideration in determining the intent of the contracting parties. *Fisher v. Congregation of B'Nai Yitzhok*, 177 Pa.Superior Ct. 359, 110 A.2d 881 (1955);

*Lancaster Transportation Co. v. New York and New Brunswick Auto Express Company*, 187 Pa.Superior Ct. 621, 146 A.2d 150 (1958) in *Pittsburgh National Bank v. Allison Engineering Co.*, 279 Pa.Superior Ct. 442, 447–8, 421 A.2d 281, 284 (1980).

Moreover, the Uniform Commercial Code, as embodied into Pennsylvania law defines Usage of Trade as

any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. 13 Pa.C.S.A. § 1205(b).

■ The evidence of usage of trade as supporting appellee's subjective intent falls far short of establishing that the agreement between the parties gave rise to appellee's option to terminate it. For example, in *Pittsburgh National Bank v. Allison Engineering Co., supra,* 279 Pa.Superior Ct. at 449, 421 A.2d at 285, the court looked to two previous cases which illustrated that the custom proposed by one of the parties to bolster its position had become so universally accepted as to become a rule of law. And, in *Lancaster Transportation Co., supra,* 187 Pa.Superior Ct. at 623, 146 A.2d at 151, this court said that to establish a custom, the evidence by which it is proposed to prove it, must be clear, uncontradictory and distinct ... so ... as to leave no doubt upon the mind with reference to its nature and character (cit. omitted).

In the instant case, Mr. Haas, the original seller, offered testimony that in similar situations, purchasers had terminated blanket orders with him. But he did not state that he expected such treatment in the custom of the business; rather, he expressed some dissatisfaction with the fact that it happened at all. And, as for Fadale's testimony, he supplied no previous experiences with such custom and usage, but spoke in theoretical terms regarding his asserted

rights to terminate. Appellee has not presented any case law to support his assertion of such a custom.

On the other hand, the challenged sentence "PLEASE NOTE THAT ABOVE RELEASE SCHEDULE TO BE RE-VIEWED QUARTERLY" was explained by appellant to mean only what it states, that the rate at which the 7500 humidifiers were to be released to appellee could be altered quarterly. We are not persuaded that the evidence presented by appellee Pennco supports any other interpretation.

Therefore, verdict and judgment reversed and a new trial is ordered.

SPAETH, J., filed a dissenting opinion.

SPAETH, Judge, dissenting:

Rather than grant a new trial, I should vacate the judgment in favor of appellee, enter judgment n.o.v. in favor of appellant, and remand for a hearing on damages.

Not only do I find the jury verdict to be against the weight of the evidence, as does the majority, but I further find that there was insufficient evidence to support the verdict. In reviewing a trial court's denial of a judgment n.o.v., the evidence, and all reasonable inferences from it, must be viewed in the light most favorable to the verdict winner. *Szumski v. Lehman Homes, Inc.*, 267 Pa.Super. 478, 406 A.2d 1142 (1979). All conflicts in the evidence must be resolved in favor of the verdict winner. *Id.* But if after this standard is applied it appears that there is insufficient evidence to support the verdict, judgment n.o.v. should be entered. *Id.* Here, as the majority observes, the evidence is uncontroverted that the parties did not arrive at a mutual understanding as to the meaning of the phrase at issue. At 26–29. Also as the majority observes, the evidence of trade usage was insufficient to establish a custom or usage in the trade consistent with appellee's interpretation of the phrase. At 29–31. Accordingly,

the verdict, representing as it did a finding that the parties *had* agreed upon appellee's interpretation of the phrase, was unsupported by the evidence.

Given that the parties did not arrive at a mutual understanding as to the meaning of the phrase at issue, the court was required to rely upon a rule of construction to resolve the dispute. Since the writing in question was drafted by appellee, and since it was ambiguous, the appropriate rule of construction was that it should be construed against appellee.[1] *See Central Transportation, Inc. v. Board of Assessment Appeals of Cambria County,* 490 Pa. 486, 417 A.2d 144 (1980); *In re Breyer's Estate,* 475 Pa. 108, 379 A.2d 1305 (1977); *Burns Manufacturing Co., Inc. v. Boehm,* 467 Pa. 307, 356 A.2d 763 (1976). *See also* Restatement (Second) of Contracts § 206 (1981). The reasoning behind this rule of construction is well-stated in Comment a to Section 206 of the Restatement (Second) of Contracts:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party.

I should therefore hold that the phrase in question did not give appellee the right to terminate the contract upon quarterly review.

Accordingly, I should vacate the judgment in favor of appellee, enter judgment n.o.v. in favor of appellant, and remand for a hearing on damages.

---

**1.** Although the phrase in question may more naturally be read as interpreted by appellant, it is not so free from ambiguity as to warrant application of the plain meaning rule. *See Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659 (1982).