506 A.2d 901

Joseph J. GEYER and Regina H. Geyer, Appellants,

v.

John STEINBRONN, Raymond Miley, Sr., Miley Security, Inc., Miley Detective Agency, Inc., and Service Review, Inc.

Joseph J. GEYER and Regina H. Geyer

v.

John STEINBRONN, Raymond Miley, Sr., Miley Security, Inc., Miley Detective Agency, Inc. and Service Review, Inc.

Appeal of John STEINBRONN and Miley Security, Inc.

Joseph J. GEYER and Regina H. Geyer

v.

John STEINBRONN, Raymond Miley, Sr., Miley Security, Inc., Miley Detective Agency, Inc. and Service Review, Inc.

Appeal of John STEINBRONN, and Miley Security, Inc.

Superior Court of Pennsylvania.

Argued March 20, 1984.

Filed Feb. 3, 1986.

Reargument Denied March 21, 1986.

538

540

Edward C. German, Philadelphia, for Service Review, appellant (at 2640 and 2641) and appellee (at 2639).

Stephen C. Vondercrone, Jr., Lansdale, for Steinbronn, appellant (at 2640 and 2641) and appellee (at 2639).

George J. O'Neill, Philadelphia, for Geyer, appellants (at 2639) and appellees (at 2640 and 2641).

Before SPAETH, President Judge, and BECK and TAMILIA, JJ.

BECK, Judge:

The instant litigation arose out of an unfavorable employment recommendation concerning plaintiff Joseph Geyer. Plaintiff sued defendants Miley Security Service Inc., his former employer; John Steinbronn, Miley Security's vice president and plaintiff's former supervisor; Raymond Miley Sr., an alleged officer of Miley Detective Agency, Inc., the corporate alter ego of Miley Security; and Service Review, Inc., a mercantile reporting agency.

Plaintiff alleged that defendants communicated to plaintiff's prospective employer, Sears, Roebuck & Co., a false and defamatory report of his employment record which caused Sears not to hire him. Plaintiff's complaint rested on the theories of defamation and intentional interference with prospective contractual relations. Plaintiff's wife Regina Geyer claims for the resulting loss of consortium.

At the close of the jury trial, the court directed verdicts in favor of Raymond Miley Sr., Miley Detective Agency and Service Review Inc. The jury returned a verdict in favor of plaintiffs against Steinbronn and Miley Security Services, assessing $100,000 in compensatory damages for Mr. Geyer, $35,000 damages for Mrs. Geyer's loss of consortium, and $50,000 punitive damages against Steinbronn only.

Appellants[1] John Steinbronn and Miley Security Services appeal from the judgment entered on the verdict, raising issues which we will divide for the sake of convenience into several categories. First, appellants attack the verdicts on the defamation and intentional interference with contract counts as against the evidence, the weight of the evidence and the law. Secondly, they claim error in the court's charge to the jury on these counts.[2] Thirdly, they contend that the damages awarded were excessive. Finally, appellants argue that the trial court abused its discretion in opening a judgment of non pros entered in favor of all defendants, thereby allowing the action to proceed to trial.

Plaintiffs cross-appeal from the trial court's orders directing verdicts in favor of Raymond Miley, Sr. and Service Review Inc.[3] and denying various other motions of plaintiffs. Plaintiffs allege the following specific errors:

1. The Court Erred In Refusing Plaintiffs' Motion To Amend The Caption and Complaint To Correct Misnomer of Raymond Miley, Sr., Defendant.

2. The Court Erred In Refusing To Admit The Deposition Of John Steinbronn As Plaintiffs' Evidence Against Service Review, Inc., And All Other Defendants.

3. The Court Erred In Granting The Motions Of Defendants Service Review, Inc., And Raymond Miley For A Directed Verdict.

4. The Court Erred In Refusing Plaintiffs' Points For Binding Instructions; Plaintiffs' Motions For Directed Verdicts Against Service Review, Inc., And Raymond Miley, Jr., And Plaintiffs' Motions For Judgment N.O.V. Upon The Whole Record Against Said Defend-

1. Hereinafter the word "appellants" refers only to these defendants unless otherwise specified.

2. Appellants' brief states as a separate issue "Defendants are entitled to judgment n.o.v." We believe this question is properly treated in conjunction with the foregoing claims, especially appellants' challenges to the sufficiency of the evidence.

3. Plaintiffs raise no issues relating to the grant of a directed verdict in favor of defendant Miley Detective Agency Inc.

ants Or In The Alternative, For A New Trial As To Those Defendants Only.

5. The Lower Court Erred In Denying Plaintiffs' Motion For Assessment Of Damages For Delay Pursuant To Pa.R.C.P. No. 238.

For the reasons stated below we affirm.

## NON PROS APPEAL

■ Pursuant to Pa.R.A.P. 311(d)(1)(i), appellants contest on appeal the trial court's opening of a non pros judgment entered in their favor. *See Valley Forge Historical Society v. Washington Memorial Chapel,* 330 Pa.Super. 494, 479 A.2d 1011 (1984), *allocatur denied,* October 15, 1984.

Plaintiffs commenced this action by filing a summons in trespass on October 30, 1974. On October 23, 1975, defendants Steinbronn, Miley Sr., and the Miley companies filed a praecipe for rule to file a complaint within twenty days. The praecipe and rule were served on plaintiffs, but plaintiffs did not file a complaint within the requisite time period. On November 28, 1975, a judgment of non pros was entered in favor of all the defendants. On December 12, 1975, plaintiffs petitioned the court to strike or open the non pros judgment. The plaintiffs' petition was granted on June 17, 1976.

A petition to open a judgment of non pros is directed to the equitable powers of the court and as such, is " 'by way of grace and not of right. Its grant or refusal is peculiarly a matter for the lower court's discretion. An appellate court may not reverse the lower court's ruling unless an abuse of discretion is clearly evident....' " *Lewis v. Reid,* 244 Pa.Super. 76, 80, 366 A.2d 923, 924 (1976) (citation omitted), *aff'd on reargument,* 244 Pa.Super. 599, 371 A.2d 872 (1976), *allocatur denied,* April 7, 1977.

Three requirements must be satisfied before a non pros judgment may be opened: (1) the petition to open must be promptly filed; (2) a reasonable explanation or excuse must be offered for the petitioner's defective conduct (here, the

failure to file a timely complaint), and (3) facts constituting grounds for petitioner's underlying cause of action must be alleged. *Wurster v. Peters*, 318 Pa.Super. 46, 464 A.2d 510 (1983); *Reid.*

In the case sub judice, plaintiffs filed their petition to open the non pros judgment within fifteen days of the entry of said judgment; hence, the petition to open was promptly filed. Furthermore, the complaint attached as an exhibit to the plaintiffs' petition to open averred facts establishing grounds for a cause of action in defamation and a cause of action for intentional interference with prospective contractual relations. *See Kennedy v. Board of Supervisors of Warminster Township*, 243 Pa.Super. 46, 364 A.2d 442 (1976); *see also* discussion of both substantive issues, *infra.* Finally, plaintiffs explained that their complaint was not filed within the time frame stipulated by the court's rule because plaintiffs' counsel and defendants' counsel agreed to an extended filing date for plaintiffs' complaint.

Given these circumstances, we hold that the trial court did not clearly abuse its discretion in finding that the plaintiffs met the criteria for opening the judgment of non pros, and accordingly, we affirm the opening of that judgment.

## FACTUAL BACKGROUND

Plaintiff Joseph Geyer applied for employment as a security assistant with Sears, Roebuck & Co. in December 1972 and again in August 1973. He listed Miley Security Services on his application as one of his former employers and stated as his reason for leaving, "Could not get along with vice president [Steinbronn]. Resigned." Plaintiff was interviewed by Sears and offered a position which he accepted. R. 526a–527a, 531a. On October 15, 1973, Iva Reiter, a personnel manager for Sears, wrote Geyer instructing him to report on November 19, 1973 for a physical examination and to begin work. Her letter also informed Geyer that Sears would conduct a routine investigation of his employment references and personal background.

Sears engaged Service Review to conduct the investigation. Service Review's initial report stated that no criticisms were forthcoming from any contact, including Miley Security. At the same time, though, Sears sent its own reference request to several of Geyer's former employers. On October 25, 1973, Steinbronn responded to this request with a letter containing the following statements concerning Geyer:

In reply to your request for information on Joseph J. Geyer.

1. In the two month period Joseph Geyer was employed as a manager of Security Guards, he could not cope with the duties assigned.

a. He would leave the office and revert to drinking and use a company car.

b. He was informed not to use a company car for any reason. Taking a 1972 vehicle he did at 10:00 p.m. on Luzerne Street run head on into a pole—resulting in $800.00 in damages.

c. He was fired as a result of his failure to obey directives and orders.

d. His signature has been found on several checks as an endorsor. By letter we requested of him to call our office for an appointment, as we are investigating forgeries—but he failed to respond.

e. Our case is being turned over to the District Attorney of Bucks County and I am sure he will be sent for, to explain his signature or disprove his signature.

f. His services were poor and in no case would we re-employ.

Mrs. Reiter telephoned Geyer to discuss the conflicting reports. Geyer provided her with a favorable letter purportedly signed by Steinbronn, dated May 17, 1973.[4] Sears then requested Service Review to conduct a personal interview with Steinbronn. Service Review sent Wayne Rowland, a field inspector, to interview Steinbronn. Rowland

**4.** Steinbronn maintains that this letter was drafted without his authorization and his signature was forged.

was instructed simply to report Steinbronn's statements to Iva Reiter without any further evaluation or verification. Rowland's narrative report of the interview reads as follows:

Subject worked here as a security guard from 3–12–73 to 5–13–73.

Subjects file was not here at this office as his file has been forwarded to the lawyers office of the Miley Security Inc. for the turning over to the D.A.'S office in Bucks County for possible charges being filed against the named subject for theft by forgery.

A. Many checks have been forged and they are in the process of checking various avenues that all lead to the subject in question.

B. Subject even received a 100 dollars in check from the employees credit union after he was out of the employ of Miley a week after they released him from duty. (They believe he had a co worker inside here working with him).

C. Subject was not susposed [sic] to drive any company cars as the insurance co. that insures these cars had a rider that excluded the subject due to a drink problem he had suffered and was susposed [sic] to have been cured of, but it seems that the 25th police dist. in Phila. called in here after a car had been wrecked and left in there [sic] dist. by the subject.

D. Letter sent to Sears and Roebuck Company with a recommendation for employment was never written by any authorized personnel here in this office, even though it was signed by the V.P.—he states that it does not bear his signature, but that it is a forged signature.

Interview was with Mr. John Steinbrown [sic] V.P. for the Miley Security Inc.

(Misspellings, grammatical and syntactical errors in original.)

Rowland testified at trial that this written report accurately related the substance of his conversation with Steinbronn.

On November 2, 1973, Iva Reiter wrote Geyer informing him that Sears would not be hiring him after all and that

this decision was "based, at least in part, on the information obtained" from Service Review.

At trial plaintiffs presented a version of the facts markedly different from that suggested by Steinbronn's letter and Service Review's report. Joseph Geyer testified that he did not miss work at Miley because of his drinking. He did acknowledge difficulties with alcoholism both before and after that time. With respect to the auto accident, Geyer testified that he had been specifically instructed by Steinbronn to use the car that evening, and that following the accident there was an argument with Steinbronn about whether the company markings on the car had been covered as Steinbronn had ordered, not about whether he had been intoxicated. Geyer stated he was not fired for this incident; he insisted he resigned voluntarily shortly thereafter because of the continuing personality conflict between him and Steinbronn. This conflict manifested itself in Steinbronn's constantly screaming and hollering at him and otherwise making unreasonable demands. Geyer also testified that he did not participate in any forgery and did not negotiate any forged checks, and that no one from Miley had ever contacted him regarding a forgery investigation.

Plaintiffs also produced the deposition testimony of John Steinbronn, read into the record as his admissions. Steinbronn stated that he knew who the forger was, that it was not Geyer, and that Geyer was never a suspect. He stated that Geyer's file was never given to the District Attorney for criminal investigation. Further testimony indicated, or at least would support an inference, that Steinbronn knew these facts at the time he gave the information to Sears and Service Review. Steinbronn also testified that there was no employees' credit union at Miley, and that there was no insurance rider prohibiting Geyer from using company vehicles. Steinbronn claimed that he was not the source of the inaccuracies in Rowland's report and that Rowland did not accurately relate their conversation.

Both Mr. and Mrs. Geyer testified about the effects of Steinbronn's accusations and Sears' rejection of Mr. Geyer

on their lives. They related that Mr. Geyer's alcohol problems worsened precipitously; he began going on binges and was absent from the home for days. Plaintiffs' marriage deteriorated; arguments often culminated in Mr. Geyer striking his wife or breaking things. Mr. Geyer was hospitalized on three occasions over the next several years for depression and alcohol abuse, and he underwent psychotherapy. Plaintiffs testified that their difficulties finally began to abate in 1980. Mr. Geyer was able to stop drinking. The couple entered an Alcoholics Anonymous program and Mr. Geyer began to be successful in his new career as a self-employed exterminator.

It is important to note that appellants presented no testimonial evidence, but they did introduce several exhibits into evidence. Some of the documents were copies of forged checks allegedly bearing Geyer's endorsement; the remainder were primarily income tax returns relevant to the damage issues.

## DEFENDANTS/APPELLANTS' APPEAL

### I. Sufficiency and Weight of the Evidence—Liability

#### A. Defamation

Steinbronn and Miley Security Services contend that the court erred in denying their motions for judgment n.o.v. or a new trial. In addressing these issues we follow certain well-settled rules. "A judgment notwithstanding the verdict should be entered only in a clear case, when the facts are such that no two reasonable persons could fail to agree that the verdict was improper; any doubts should be resolved in favor of the verdict winner." *Merion Spring Co. v. Muelles Hnos. Garcia Torres*, 315 Pa.Super. 469, 481, 462 A.2d 686, 693, quoting *Martin v. Soblotney*, 296 Pa.Super. 145, 168–169, 442 A.2d 700, 702 (1982), *rev'd on other grounds*, 502 Pa. 418, 466 A.2d 1022 (1983). On appeal from the trial court's refusal of a motion for judgment n.o.v., "the sole duty of the appellate court is to decide whether there was sufficient competent evidence to sustain

the verdict, granting the verdict winner ... the benefit of every favorable inference reasonably to be drawn from the evidence." *Laniecki v. Polish Army Veterans Assn.*, 331 Pa.Super. 413, 417, 480 A.2d 1101, 1103 (1984), quoting *McDevitt v. Terminal Warehouse Co.*, 304 Pa.Super. 438, 442, 450 A.2d 991, 993 (1982).

A motion for a new trial should be granted only if the verdict is so contrary to the evidence as to shock the conscience of the court. *Leslie v. Pennco, Inc.*, 323 Pa.Super. 23, 470 A.2d 110 (1983). The trial court's ruling on the motion for new trial will not be reversed on appeal "absent an abuse of discretion or error of law which controlled the outcome of the case." *Laniecki*, 331 Pa.Super. at 418, 480 A.2d at 1103.

When the record is reviewed in light of these principles it is clear that the jury's verdict on the defamation counts must stand. By introducing virtually no evidence on their own behalf, appellants challenged the Geyers to meet their burden of proof. Among the elements which plaintiffs were required to establish are the defamatory character of the communication, the understanding by the recipient of its defamatory meaning, special harm resulting to the plaintiff from its publication,[5] and abuse of a conditionally privileged occasion. 42 Pa.C.S. § 8343(a)(1), (4), (6), (7).

█ Appellants make a patently meritless attempt to argue that the statements at issue were non-defamatory. A fair reading of the statements shows that they implicated Joseph Geyer in a forgery scheme in which a large amount of money was embezzled from his employer. Accusations of dishonesty or theft by an employee, even if indirect, have consistently been held to meet the test of defamatory meaning. *Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984); *Berg v. Consolidated Freightways, Inc.*, 280 Pa.Super. 495, 421 A.2d 831 (1980). *See*

5. At time of trial, plaintiffs were required to show special harm. *But see Agriss v. Roadway Express Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984) adopting rule of Restatement (Second) of Torts § 569 (1977) that all libels are actionable without proof of special harm.

*also Thomas Merton Center v. Rockwell International,* 497 Pa. 460, 463, 442 A.2d 213, 216 (1981), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982) (statement which "ascribes to another conduct, character or a condition that would aversely affect his fitness for the proper conduct of his lawful business, trade or profession" is defamatory). We note that plaintiff was pursuing a career in security, a field where integrity and trustworthiness are especially crucial. In this context the veiled accusations in the statements of Steinbronn must be viewed as capable of a defamatory meaning.

■ The understanding by the recipient (Sears) of the defamatory character of the communication is self-evident; the reports were treated as reflecting sufficiently unfavorably on Geyer's qualifications and fitness for the job that an offer of employment already made was summarily withdrawn. For the same reason, there can be no doubt that there was sufficient evidence for the jury to find special harm.

■ Finally, plaintiffs introduced sufficient evidence to meet their burden of demonstrating abuse of the conditional privilege. Plaintiffs concede that the statements of Steinbronn in response to the inquiries of Sears and Service Review are conditionally privileged. *See Zuschek v. Whitmoyer Laboratories, Inc.,* 430 F.Supp. 1163 (E.D.Pa.1977), *aff'd,* 571 F.2d 573 (3rd Cir.1978). In the private-plaintiff context, a conditional privilege may be defeated upon a showing of either negligence or malice. *Hepps v. Philadelphia Newspapers, Inc.,* 506 Pa. 304, 485 A.2d 374 (1984); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980). We agree with the trial court that the evidence was sufficient for the jury to conclude that "Steinbronn communicated in at least a negligent manner several defamatory falsehoods concerning plaintiff." Trial Court Opinion at 16.

■ Appellants suggest in their brief that the evidence establishes that the statements of Steinbronn were true. In this regard we note that our Supreme Court in *Hepps v.*

*Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), upheld 42 Pa.C.S. § 8343(b)(1), which places the burden of proving the truth of the defamatory communication on the defendant. As we have noted, defendants presented little evidence on their behalf. At best, we can say that defendants' cross-examination of plaintiff's witnesses raised some factual issues about the accuracy of Steinbronn's statements, but the jury was certainly free to resolve these conflicts in favor of the plaintiff. We must hold that defendants have failed to meet their burden of establishing truth.

For the foregoing reasons we hold defendants are not entitled to a new trial or judgment n.o.v. on the defamation claims.

B. Intentional Interference with Prospective Contractual Relations

The classic statement of the elements of an action for intentional interference with prospective contractual relations is found in *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971). The burden is on the plaintiff to establish the following:

a) the existence of a proper prospective contractual relationship between the plaintiff and a third party,

b) the defendant must act for the purpose of causing the specific type of harm to plaintiff,

c) the act must be unprivileged, and

d) actual harm must result.

■ There is little dispute concerning elements (a) and (d). Appellants make a feeble attempt to argue lack of harm based on the statement in Sears' letter to Geyer informing him that the decision to withdraw their offer was based "at least in part" on the unfavorable reports. However, the evidence was clearly sufficient for the jury to conclude that the negative remarks of Steinbronn, both directly and through Service Review, were a cause of Sears' action. Indeed no evidence suggesting any other reasons for their decision was adduced.

Appellants' main arguments go to intent and privilege. Appellants contend that the evidence fails to establish that Steinbronn acted with any "bad motive" toward Geyer. However, there was considerable evidence adduced by plaintiff that the relations between him and Steinbronn were quite hostile. This evidence could support an inference of ill will.

Moreover, even if we were to accept defendants' reading of the record, "ill will" or "bad motive" per se are not required to establish the intent element. This Court held in *Yaindl v. Ingersoll-Rand Co.*, 281 Pa.Super. 560, 422 A.2d 611 (1980), that the intent to cause harm element "must be understood as requiring only an intention to interfere with the plaintiff's prospective contractual relation and not malevolent spite by the defendant." 281 Pa.Super. at 581, n. 11, 422 A.2d at 622, n. 11. Obviously it will be the rare defendant who boldly declares that he in fact did intend to interfere with the plaintiff's prospective contractual relation. Therefore, the jury usually will be called upon to draw an inference from circumstantial evidence. The defendant's state of mind and possible motives are certainly relevant to the inquiry even if ill will per se is not a requisite. The record does not entitle us to conclude as a matter of law that there was no basis for a finding of intent.

With respect to the privilege issue, defendants cite us to Restatement (Second) of Torts § 772, which provides:

One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation by giving the third person:

(a) truthful information, or

(b) honest advice within the scope of a request for the advice.

Appellants repeat their claim made with respect to the defamation counts that Steinbronn simply stated the truth

as he believed it to be at the time. Once again we emphasize that the jury found to the contrary. There was sufficient evidence for the jury to find that many of Steinbronn's statements were not true and they were not made with a reasonable belief that they were true. Indeed there is evidence to support a finding that Steinbronn knew some of them were false. There is further no sign of a cavalier disregard by the jury of evidence favorable to appellants which would entitle us to hold the verdict against the weight of the evidence. The jury observed the witnesses and their demeanor and is therefore in the best position to assess credibility. We will not disturb the verdict on the intentional interference with prospective contractual relations count.

## II. Charge to the Jury

### A. Defamation

■ Appellants argue that the trial court erred in failing to charge the jury in accordance with its points for charge 8, 10 and 26. In considering challenges to the trial court's instructions to the jury, we must examine the charge in its entirety to determine whether the jury has been misled or prejudiced; error cannot be based on isolated excerpts. *Riddle Memorial Hospital v. Dohan,* 504 Pa. 571, 475 A.2d 1314 (1984). The failure to charge in the precise words requested by a party is not error where the instruction given is complete and correct. *Fish v. Gosnell,* 316 Pa.Super. 565, 463 A.2d 1042 (1983).

The instructions requested by appellants concern the subjects of malice and privilege. Point 8 states that a defamation plaintiff must prove malice. Point 10 states that a non-negligent publication on a conditionally privileged occasion does not give rise to liability. Point 26 states that in a conditionally privileged occasion the absence of malice is presumed and the plaintiff has the burden of proving abuse of privilege.

■ With respect to point 8, it is the law in Pennsylvania that a private figure defamation plaintiff may meet his

burden by proving that the defamatory matter was publish-ed with either malice or negligence. *Rutt v. Bethlehems' Globe Publishing Co.*, 335 Pa.Super. 163, 484 A.2d 72 (1984); 42 Pa.C.S. § 8344. The court properly refused Point 8 because it erroneously states the law. We further find that the trial court properly instructed the jury on the plaintiff's burden of proof. Without actually using the word "malice," the court clearly instructed that the plaintiff must show that the publication was made intentionally, recklessly or negligently, defining all three. As the trial court observed in its opinion, the term "malice" has been a perennial source of confusion in the law of defamation. The court instead gave a carefully crafted charge which stated the law clearly as well as correctly.

▆▆▆ With respect to Points 10 and 26, we hold that the court properly instructed the jury on conditional privilege and its abuse. Point 10 is somewhat ambiguous and in any case it is superfluous. To the extent it attempts to define when a conditionally privileged occasion exists, it is unnec-essary because the court determined at trial that a condi-tional privilege existed and the plaintiff conceded that the defamatory statements were conditionally privileged. To the extent that Point 10 is a request for an instruction that "reckless or wanton disregard of plaintiff's rights" or negli-gence ("want of reasonable cause to ascertain the truth or falsity of the statement") are required to show abuse of a conditional privilege, this subject was adequately and cor-rectly covered in the court's charge. *See Hepps; Beckman.*

▆▆▆ The trial court also correctly instructed the jury that the plaintiff has the burden of showing abuse of a conditional privilege. *See* R. 771a. The court did not use the language of Point 26 because it believed that the introduction of the problematic word "malice" would only serve to confuse and mislead. We agree and commend the trial court for its insightfulness.

B. Intentional Interference with Prospective Contractual Relations

■■■ Appellants argue that the trial court erred by failing to charge the jury according to Point 29. Point 29 states that in an action for intentional interference with prospective·contractual relations the plaintiff has the burden of proving that the defendant's conduct was not privileged. We do not address the merits of this question because it has not been preserved for appeal. Defendants failed to object in the trial court to the failure to charge on Point 29 or in any other way to the court's charge on intentional interference with prospective contractual relations. *See* R. 797a–799a. Therefore the issue is waived. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974); *Capan v. Divine Providence Hospital*, 270 Pa.Super. 127, 410 A.2d 1282 (1979).

III. Damages

A. Compensatory Damages and Loss of Consortium

Appellants contend that the compensatory damages awarded were excessive and not supported by the evidence. The assessment of damages is peculiarly within the province of the jury and the jury's award will not be upset on appeal unless it is so excessive as to shock the conscience of the court or it is clearly based on partiality, prejudice or passion. *DeSimone v. City of Philadelphia*, 380 Pa. 137, 110 A.2d 431 (1955); *Pratt v. Stein*, 298 Pa.Super. 92, 444 A.2d 674 (1982); *Padula v. Godshalk*, 192 Pa.Super. 618, 161 A.2d 919 (1960).

Appellants make several specific arguments in support of their claims. They argue that the evidence of pecuniary harm, which was primarily the wages plaintiff lost as a result of not being hired by Sears, was too conjectural and speculative to support an award of damages because the evidence established that Mr. Geyer was unable to hold a job long enough to realize such benefits which were measured over a seven year period (up until the time of trial). With regard to the noneconomic ("pain and suffering")

elements of damages, appellants argue that Mr. Geyer's alcohol problems began long before he was employed with Miley and that the psychiatric evidence was inconclusive. With regard to the loss of consortium damages awarded Mrs. Geyer, appellants contend that the plaintiffs' marital relationship had already deteriorated and Mrs. Geyer suffered no further harm as a result of appellants' conduct.

We hold that none of these factors warrant disturbing the jury's award of compensatory or loss of consortium damages. The jury was aware of the facts surrounding Mr. Geyer's employment history and it was within their province to weigh that evidence in evaluating the claim of lost wages. We find no support for a finding that the jury misapprehended or disregarded the evidence. Furthermore, it is not necessary that damages be determined with mathematical certainty. *Lokay v. Lehigh Valley Cooperative Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405 (1985); *Duquesne Light Co. v. Rippel*, 329 Pa.Super. 289, 478 A.2d 472 (1984).

With respect to the non-pecuniary elements of damage, we agree that the plaintiffs may not have started off in the best of circumstances, but a defendant must take the plaintiff as he finds him and damages are available for the aggravation of a previously existing condition. *Majors v. Brodhead Hotel*, 416 Pa. 265, 205 A.2d 873 (1965). There was evidence adduced at trial from which the jury could have found that the loss of the Sears job precipitated a worsening of Mr. Geyer's alcoholism which sent his personal life into a tailspin and caused the plaintiffs' marriage to deteriorate markedly.[6] Where the jury's determination of

---

6. Damages for aggravation of appellee's alcoholism are premised solely upon appellee's claim regarding intentional interference with his prospective contractual relationship with Sears. Such damages cannot be awarded as a result of appellee's defamation claim since "[i]n a defamation action, damages are assessed [only] based upon the harm an individual experiences to his *reputation....*" *Graham v. Today's Spirit*, 503 Pa. 52, 58, 468 A.2d 454, 458 (1983) (emphasis added). Because damages for aggravation of alcoholism cannot "'give the innocent and injured plaintiff a public vindication of his good name,'" *Graham*, 503 Pa. at 57, 468 A.2d at 45 (citation omitted),

damages is based on its assessment of the weight of conflicting evidence the appellate courts should not interfere. *See Paustenbaugh v. Ward Baking Co.,* 374 Pa. 418, 97 A.2d 816 (1953); *Lokay v. Lehigh Valley Cooperative Farmers Inc.; Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa.Super. 90, 464 A.2d 1243 (1983). Finally, the absolute amount of the verdict is not facially exorbitant or disproportionate to the damages claimed. We hold that the trial court committed no abuse of discretion in refusing to set aside or reduce the award of damages.

■ Appellants have also included in their brief an argument that the trial court erred in refusing to charge the jury on certain points relating to speculative or conjectural damages. We will not consider this claim because it was not set forth in the statement of questions involved. *Rago v. Nace,* 313 Pa.Super. 575, 460 A.2d 337 (1983); Pa.R.A.P. 2116(a).

B.   Punitive Damages

Appellants also attack the award of punitive damages, likewise contending that they were "excessive and were not supported by the evidence." We note at the outset that the punitive damage award was one-half of the compensatory damage award which we have upheld, so this case does not raise the issue of a punitive damages award disproportionate to the award of compensatory damages. *Cf. Walder v. Lobel,* 339 Pa.Super. 203, n. 3, 488 A.2d 622, 627 n. 3 (1985) ("the law is unclear as to the relationship between compensatory damages and punitive damages;" collecting cases).

We therefore focus on the question whether there was sufficient evidence to support the jury's award of punitive damages. Since we must have a yardstick against which to measure the evidence, this allegation of error necessarily leads us into an examination of the proper standard for

such damages would violate the mandate of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974), that "state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved."

awarding punitive damages. The trial court charged the jury in accordance with Restatement (Second) of Torts § 908 (1977). Under the Restatement formulation, punitive damages are available where there has been "outrageous conduct," i.e. acts done with an evil motive or with reckless indifference to the rights of others. Similar language appears in our case law. *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984); *Delahanty v. First Pennsylvania Bank; Smith v. Brown,* 283 Pa.Super. 116, 423 A.2d 743 (1980).

However, *Feld, Delahanty* and *Smith* are not defamation cases. Because punitive damages in defamation actions are in effect a punishment for speech[7], the formulation of the appropriate standard has been influenced by constitutional considerations. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974), the United States Supreme Court held, "[T]he States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." This is, of course, the familiar "actual malice" formulation of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The scope of the *Gertz* holding was not clear. Some jurisdictions viewed the *Gertz* standard as applicable only to suits against the news media; others applied the *Gertz* standard to non-media defendants as well. *Compare General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976); *Gibby v. Murphy,* 73 N.C.App. 128, 325 S.Ed.2d 673 (1985); *and Fleming v. Moore,* 221 Va. 884, 275 S.E.2d 632 (1981)(applying *Gertz* to non-media defendant cases) *with Roemer v. Retail Credit Co.,* 44 Cal.App.3d 926, 119 Cal. Rptr. 82 (1975); *Vinson v. Linn-Mar Community School District,* 360 N.W.2d 108 (Iowa 1984); *and Greenmoss Builders v. Dun & Bradstreet Inc.,* 143 Vt. 66, 461 A.2d 414 (1983), *aff'd on other grounds,* 472 U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (holding *Gertz* not applicable to cases not involving public figures or media defendants).

7. *See* R. Sack, *Libel, Slander, and Related Problems* 349 (1980).

The United States Supreme Court granted certiorari in *Greenmoss Builders* and clarified the scope of *Gertz,* but the Court eschewed the media-nonmedia distinction. Instead, in *Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), a plurality of the Court[8] held that "permitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." *Id.* at 2948.

The instant case does not involve speech on a matter of public concern. Therefore, under *Greenmoss Builders* the actual malice standard is not mandated as a matter of federal constitutional law. However, since *Greenmoss Builders* was decided strictly within the context of whether the First Amendment imposed restrictions on state defamation law, a state is free to adopt actual malice as the standard for awarding punitive damages in defamation actions not involving statements of public concern or to continue using actual malice if it has already been doing so, even though the Constitution does not require it.

The decisions of our courts in defamation cases have not been consistent. In *Hepps v. Philadelphia Newspapers, Inc.,* 506 Pa. 304, 485 A.2d 374 (1984), *prob. juris. noted,* —— U.S. ——, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985), our Supreme Court applied the actual malice holding of *Gertz. Hepps,* however, involved speech on a public issue. Although *Hepps* is instructive on the punitive damages question now before us, *Hepps* is not entirely apposite to the case sub judice. The Pennsylvania Supreme Court's decision in *Hepps* predates the United States Supreme Court's

---

**8.** Justice Powell announced the judgment of the Court in an opinion joined by Justices Rehnquist and O'Connor. The Chief Justice concurred, stating that he would simply hold that *Gertz* did not apply because the allegedly defamatory statements involved did not relate to a matter of public concern. Justice White concurred on the alternative grounds that *Gertz* should be overruled or because the defamatory statement in question did not deal with a matter of public concern. Justice Brennan wrote a dissenting opinion joined by Justices Marshall, Blackmun and Stevens.

decision in *Greenmoss Builders.* *Hepps* is explicitly based on the United States Supreme Court's *Gertz* opinion which required proof of actual malice to justify a punitive damages award, *Hepps,* 506 Pa. at 330, 485 A.2d at 388, and which did not articulate a distinction between defamation actions involving public concerns and those involving private concerns. *See Greenmoss Builders.* Moreover, the defamatory speech in *Hepps* involved a matter of public interest [9] (five investigative articles printed in a newspaper of general circulation) whereas the defamatory remarks in the instant case concern a matter of solely private interest.

In cases not involving speech on matters of public concern, the decisions of this Court have been conflicting. In *Laniecki v. Polish Army Veterans Association,* 331 Pa.Super. 413, 423, 480 A.2d 1101, 1106 (1984), we "observe[d] that Pennsylvania has embraced Section 908 of the Restatements (Second) of Torts and the Comments thereunder as to punitive damages." Two months later, though, this Court cited the *Gertz* actual malice standard for punitive damages in a private defamation case, *Agriss v. Roadway Express Inc.,* 334 Pa.Super. 295, 483 A.2d 456 (1984). The discussion of punitive damages in *Agriss* is arguably dictum, since *Agriss* was an appeal from an order entering a nonsuit. Obviously, no damage issues were ripe at that point.

The most recent statement of our courts on the issue merely compounds the confusion. In *Walder v. Lobel,* 339 Pa.Super. 203, 211, 488 A.2d 622, 626 (1985), this Court held, "To justify punitive damages, the plaintiff must show *actual malice* on the part of the defendant" (emphasis added). However, this apparently clear statement is made somewhat ambiguous because the court cited as authority for this statement both *Feld,* which applied section 908 of the Restatement, and *Hepps,* which applied the actual malice standard of *Gertz.* The source of the ambiguity may be a pre-*New York Times v. Sullivan* decision of the Pennsylva-

---

**9.** Since *Hepps* involved a matter of public concern, the actual malice standard for punitive damages would apply to *Hepps* under the reasoning of *Gertz* or *Greenmoss Builders.*

nia Supreme Court, *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963), which described the evil motive/outrageous conduct standard of the Restatement as "actual malice." Because the court in *Walder* did not elaborate further on its holding, it is not completely clear which meaning of "actual malice" was intended.

■ As we have noted above, the effect of the United States Supreme Court's decision in *Greenmoss Builders* is to leave the determination of the appropriate standard for awarding punitive damages in defamation actions in the hands of the individual States. Therefore, although *New York Times* actual malice is not constitutionally required, we may choose to adopt it for other reasons. After careful consideration of the issue we have concluded that knowledge of or recklessness as to falsity of the publication, i.e. actual malice as defined in *New York Times v. Sullivan*, is the proper standard for awarding punitive damages in defamation cases not involving speech on matters of public concern.

There are two threads which run consistently through the otherwise jumbled body of law on punitive damages. The first is that punitive damages are appropriate only where there has been conduct more egregious than that which merely establishes the underlying tort.[10] The second is that the purpose of punitive damages is to punish the egregious wrongdoer and to deter the defendant and others from engaging in such conduct. *See Delahanty v. First Pennsylvania Bank N.A.*, 318 Pa.Super. 90, 128–30, 464 A.2d 1243, 1262–63 (1983). Punishment focuses more directly on

---

10. One apparent exception to this principle is in the public issue area, where *Gertz* seems to suggest that the same standard which must be met to establish liability (actual malice) is also sufficient to permit an award of punitive damages. One commentator proposes that in public issue cases punitive damages should be awarded only where the plaintiff proves both actual malice and ill-will, or "common law" malice. *See* Note, *Punitive Damages and Libel Law*, 98 Harv.L.Rev. 847, 860 (1985). This issue was not addressed by the Supreme Court in *Greenmoss Builders;* the opinion of the plurality does not suggest that a standard higher than actual malice would be required to award punitive damages in a case involving speech on a public issue.

the individual and carries with it the idea of moral blame-worthiness. Deterrence, on the other hand, involves the social goal of preventing further harm by imposing an additional economic disincentive on the wrongful conduct.

Both meanings of the word "malice" define conduct more egregious than the ordinary negligence required to establish liability in private plaintiff-private defendant defamation cases. However, the two kinds of malice address different aspects of the defendant's conduct. It has been said that ill-will malice of the type described in section 908 of the Restatement, which we shall describe hereinafter as "common law malice," refers to the defendant's attitude towards the plaintiff whereas actual malice as defined in *New York Times v. Sullivan* refers to the defendant's attitude toward the truth. *See* Note, *Punitive Damages and Libel Law*, 98 Harv.L.Rev. 847 (1985).

The question therefore becomes one of which type of conduct we wish to punish and deter through the vehicle of punitive damages. The principle that punitive damages are only appropriate for conduct which is intentionally wrongful and therefore morally blameworthy at first suggests the conclusion that common law malice is the appropriate standard, because the concept of "ill will" directly connotes intent to harm the plaintiff. *See* J. Sales, *Punitive Damages: The Doctrine of a Bygone Era*, at 5–6 (1984), *citing* Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 S.Cal.L.Rev. 1, 21–22 (1982). Indeed, actual malice has been described as "less evil" than common law malice. K. Redden and L. Schlueter, *Punitive Damages* 80 (Cum.Supp.1983).

We disagree with this view and hold that the actual malice standard defines more closely the kind of intentionally wrongful conduct which should be the subject of our concern in imposing punitive damages in defamation actions. Although the "ill will" component of common law malice clearly involves conduct directly intended to harm the plaintiff, actual malice conduct is equally intentional with respect to the falsity of the publication. This is so

whether the finding of actual malice is based on knowing or reckless conduct. Knowingly publishing a falsehood definitionally involves actions of an intentional nature. Recklessness, while ostensibly distinguishable from intentional conduct,[11] has been defined strictly in this context as entertaining serious doubts about the truth of the publication. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). This high level of scienter suggests a deliberate decision to proceed in the face of known risks which we believe closely approaches intentional conduct.

Although both the deliberate lie and the malevolent attack are morally blameworthy, we believe that our standard for assessing punitive damages in defamation actions should focus on the former. In its essence the law of libel is concerned with the harm which may be done to a citizen's reputation by the communication of false and defamatory statements concerning him. The wrongful act committed by the defamer, i.e. the act which causes the harm to the plaintiff, is therefore the publication of the libelous words, not the holding of a malevolent or spiteful attitude towards the plaintiff. A hateful attitude towards the plaintiff without more may be thought of as a non-actionable opinion. Indeed, since truth is an absolute defense the person who communicates a statement solely for the most despicable motives escapes liability if the statement is true. In other words, the law should focus not on attitudes but on the nature of the defendant's actions.

It has also been said that the defendant who acts with actual malice may not intend to hurt the plaintiff at all. For example, a publisher may go ahead with a questionable story which he feels will sell more newspapers, or in the private context an employee may seek to improve his chances for a promotion. *See* K. Redden and L. Schlueter, *supra,* main volume at § 13.15. However, even if the immediate motive of the deliberate or reckless liar may not

11. *See* Note, *Punitive Damages and Libel Law, supra* at 854 ("the need to demonstrate intentional wrongdoing is not implicit in the actual malice standard as it is in the common law malice standard").

be to harm the plaintiff, he does at least have reason to know that harm may result from his conduct. Therefore we may characterize his conduct as a deliberate choice to seek his own advantage regardless of the possible consequences to others or a decision that the benefits to him outweigh the potential risks that others will be harmed and he will be held accountable.[12] Such conduct of a calculated nature seems to be precisely the kind of wrongfulness to which we should attach a "punitive" sanction.

For similar reasons we believe that the actual malice standard better meets the goals behind the policy of deterrence. The most meaningful kind of deterrence is obviously that which directly addresses the wrongful act itself, which as we have noted above involves the communication of false defamatory statements about the plaintiff. "Ill will" is not easily amenable to regulation. Courts and laws cannot realistically "deter" someone from disliking or hating another. However, the law can encourage a person to be more careful about what he says publicly about another, including the object of his ill will.

In the context of determining when liability should be imposed, one commentator has reasoned that the social interest in a communication is not diminished by the fact that the speaker may be motivated by ill will toward the plaintiff, so long as the speaker is not knowingly or intentionally lying. See R. Smolla, Let the Author Beware: The Rejuvenation of the American Law of Libel, 132 U.Pa.L. Rev. 1, 80 (1983). It seems that this reasoning may be applied to the assessment of damages as well, leading to the conclusion that the additional sanction of punitive damages should be imposed only where the defendant has intentionally lied or has acted in reckless disregard of the truth.

12. A similar concept is included within the meaning of common-law malice. The Restatement includes in its definition of "outrageous conduct" conduct involving the defendant's "reckless indifference to the rights of others." Restatement (Second) of Torts § 908(2)(1977). This shows that the two kinds of malice overlap significantly but does not affect our conclusion that actual malice is the better standard.

██ Although we hold that the actual malice standard applies, we nonetheless affirm the award of punitive damages because the only context in which the issue is brought before us is sufficiency of the evidence. As we have discussed above in connection with the absence of a privilege to interfere with a prospective contractual relation (see supra at 13), there was evidence which would support a finding of Steinbronn's knowledge of the falsity of the statements. Hence there was sufficient evidence of the actual malice required to support an award of punitive damages. *Cf. Mazer v. William Bros. Co.,* 461 Pa. 587, 337 A.2d 559 (1975); *Lobianco v. Property Protection Inc.,* 292 Pa.Super. 346, 437 A.2d 417 (1981) (appellate court may affirm trial court on any grounds, including grounds not relied on below).

## PLAINTIFFS' CROSS–APPEAL

We have reviewed the record with respect to the issues raised by plaintiffs' cross-appeal and find that the opinion of the trial court, at pp. 35–44, adequately addresses these issues. We therefore affirm the trial court's denial of plaintiff's various requests for relief.

## CONCLUSION

The trial court is affirmed.

SPAETH, P.J., files concurring statement.

TAMILIA, J., joined Judge SPAETH's concurring statement on the issue of punitive damages but otherwise joined Judge BECK's Opinion.

SPAETH, President Judge, concurring*:

I concur in the result. I am unable to join the majority's discussion of the punitive damages issue, for it suggests that the issue is novel and that therefore we must discuss and decide it. In fact the Supreme Court has already

---

* President Judge SPAETH wrote this concurring statement before the expiration of his term on the court.

discussed and decided whether Pennsylvania law requires proof of actual malice (knowing falsehood or reckless disregard of the truth) or common law malice (spite or ill will) for the recovery of punitive damages. The law requires actual malice, and it has for many years. *See Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 331–332, 485 A.2d 374, 388 (1984) ("To justify punitive damages, the plaintiff is called upon to satisfy the 'actual malice' test."); *Montgomery v. Dennison*, 363 Pa. 255, 270, 69 A.2d 520, 528 (1949) ("malice does not necessarily mean a particular ill-will toward another; it comprehends in certain cases '*recklessness of consequences and mind regardless of social duty*' ") (emphasis in original). *Dun & Bradstreet v. Greenmoss Builders*, —— U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), in no way affected this principle, and is in my view irrelevant to our decision here.

TAMILIA, J., joined on the issue of punitive damages but otherwise joined Judge BECK's opinion.